IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| RICARDO BRIONES, | § | |
| | § | |
| Plaintiff, | § | |
| | § | NO. 1:17cv29 |
| vs. | § | |
| | § | JURY TRIAL DEMANDED |
| FEDEX FREIGHT, INC., | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AS TO
LIABILITY AND CERTAIN AFFIRMATIVE DEFENSES**

## <u>TABLE OF CONTENTS</u>

I.    FedEx Violated a Federal Safety Statute When It Fired Mr. Briones for Refusing
      to Drive a Truck That Violated DoT Regulations and That Was Unsafe. . . . . . . . . . . . . 1

      A.    Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      B.    This Employment Case Arises Under the Surface Transportation Assistance
            Act, Which Protects Both Employees and the Public from the Risk of
            Serious Injury or Death Due to Unsafe Trucks. . . . . . . . . . . . . . . . . . . . . . . . . 2

      C.    FedEx Fired Mr. Briones After He Refused to Drive an Unsafe Truck That
            Violated DoT Regulations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      D.    Even If Mr. Briones Was "Loud" and "Rude," His Conduct Remained
            Protected by the Surface Transportation Assistance Act Because It
            Was Not "Opprobrious." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

II.   FedEx Is Liable as a Matter of Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

III.  Affirmative Defenses 4, 8, 9, 10, and 11 Are Without Merit . . . . . . . . . . . . . . . . . . . . 18

      A.    Mitigation of Damages (Affirmative Defense 4) . . . . . . . . . . . . . . . . . . . . . . . 18

      B.    Administrative Requirements (Affirmative Defenses 8, 9, and 11) . . . . . . . . . . 19

      C.    After-Acquired Evidence (Affirmative Defense 10) . . . . . . . . . . . . . . . . . . . . . 20

IV.   Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| RICARDO BRIONES, | § | |
| | § | |
| Plaintiff, | § | |
| | § | NO. 1:17cv29 |
| vs. | § | |
| | § | JURY TRIAL DEMANDED |
| FEDEX FREIGHT, INC., | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AS TO
LIABILITY AND CERTAIN AFFIRMATIVE DEFENSES**

Plaintiff Ricardo Briones files this Motion for Summary Judgment as to Liability and Certain Affirmative Defenses.

I.      FedEx Violated a Federal Safety Statute When It Fired Mr. Briones for Refusing to Drive a Truck That Violated DoT Regulations and That Was Unsafe.

A.      Overview

Mr. Briones was a truck driver for FedEx.  Mr. Briones was not driving the smaller delivery vans.  He drove a full sized truck consisting of a tractor unit attached to a trailer.

Mr. Briones' tractor developed a problem with its air blower – the system that allows a driver to defrost or defog the windows.  DoT regulations mandate this system.  *E.g.,* 49 CFR §§ 393.79, 571.103.  The regulations require this system to be "in safe and proper operating condition at all times."  49 C.F.R. § 396.2(a)(1).  The system in Mr. Briones' tractor failed completely.

FedEx told Mr. Briones to drive the tractor anyway.  Mr. Briones refused and asked for a different tractor.  After an argument, FedEx grudgingly relented and gave him a different tractor. FedEx then fired him for insubordination, claiming that he was "loud" and "rude" when he refused to drive the first tractor.  Mr. Briones now sues for wrongful termination under federal law.

1

B.    This Employment Case Arises Under the Surface Transportation Assistance Act, Which Protects Both Employees and the Public from the Risk of Serious Injury or Death Due to Unsafe Trucks.

Most employment cases arise under Title VII of the Civil Rights Act of 1964, which prohibits discrimination on the basis of race, sex, and other characteristics, or under similar statutes involving age and disabilities.  In cases under these statutes, the plaintiff must establish a prima facie case of discrimination under the *McDonnell Douglas* framework and must prove that the employer's stated reason for the termination was a pretext for discrimination.

This is a different sort of case.  Congress has enacted numerous statutes designed to protect the public.  For example, these statutes prohibit unsafe workplaces, unsafe operation of trucks, and financial fraud.  Many of these statutes protect employees who report violations or who refuse to engage in unlawful or dangerous activities.  These are not anti-discrimination provisions, as such, but rather are intended to protect the public by effectuating the underlying safety statutes.

These statutes require the employee to file a complaint with OSHA, which is the agency tasked with administering the whistleblower protection laws.  The various statutes set different deadlines for filing a complaint and contain a multitude of different rules and requirements.[1]

Mr. Briones is seeking relief under the Surface Transportation Assistance Act (STAA), 49 U.S.C. § 31105.  In pertinent part, the STAA provides:

(1)    A person may not discharge an employee, or discipline or discriminate against an employee regarding pay, terms, or privileges of employment, because –

. . . .

(B)    the employee refuses to operate a vehicle because -

---

[1]    OSHA has published a comprehensive description of the various statutes at https://www.osha.gov/OshDoc/data_General_Facts/whistleblower_rights.pdf.

2

(i) the operation violates a regulation, standard, or order of the United States related to commercial motor vehicle safety, health, or security; or

(ii) the employee has a reasonable apprehension of serious injury to the employee or the public because of the vehicle's hazardous safety or security condition.

*Id.* § 31105(a)(1). Subsection (b)(1) of STAA adopts the burdens of proof from the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (AIR 21), 49 U.S.C. § 42121. This was the result of a 2007 amendment contained in the 9/11 Commission Act.

The AIR 21 standards apply to many different federal whistleblower statutes, such as Sarbanes-Oxley (SOX). AIR 21 provides for burdens of proof that are different from the familiar Title VII framework. The employee must show that the protected activity was a "contributing factor" to the termination, and then the employer must prove <u>by clear and convincing evidence</u> that it would have fired the employee anyway:

(i) **Required showing by complainant.** — The Secretary of Labor shall dismiss a complaint filed under this subsection and shall not conduct an investigation otherwise required under subparagraph (A) unless the complainant makes a prima facie showing that any behavior described in paragraphs (1) through (4) of subsection (a) was a <u>contributing factor</u> in the unfavorable personnel action alleged in the complaint.

(ii) **Showing by employer.** — Notwithstanding a finding by the Secretary that the complainant has made the showing required under clause (i), no investigation otherwise required under subparagraph (A) shall be conducted if the employer demonstrates, <u>by clear and convincing evidence</u>, that the employer would have taken the same unfavorable personnel action in the absence of that behavior.

49 U.S.C. § 42121(b)(2)(B) (emphasis added). Most of the statutes subject to AIR 21 permit an employee to file a de novo lawsuit in federal court if OSHA does not resolve the case within a specified amount of time. If so, the AIR 21 framework continues to apply to the federal lawsuit..

*E.g., Livingston v. Wyeth, Inc.*, 520 F.3d 344, 351-52 (4th Cir. 2008).

3

The Fifth Circuit has explained the operation of the AIR 21 burden of proof and has provided the elements of a claim in the context of a SOX claim:

> The legal burdens of proof set forth in the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR 21"), govern SOX whistleblower actions.  To prevail, an employee must prove by a preponderance of the evidence that (1) she engaged in protected activity; (2) the employer knew that she engaged in the protected activity;  (3) she suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action.
>
> If the employee establishes these four elements, the employer may avoid liability if it can prove "by clear and convincing evidence" that it "would have taken the same unfavorable personnel action in the absence of that [protected] behavior."  This "independent burden-shifting framework" is distinct from the *McDonnell Douglas* burden-shifting framework applicable to Title VII claims.

*Allen v. Admin. Review Bd.*, 514 F.3d 468, 475-76 (5th Cir. 2008) (citations omitted).  In a case involving the Federal Rail Safety Act (another whistleblower protection statute), the Third Circuit explained the "contributing factor" standard in detail:

> The term "contributing factor" is a term of art that has been elaborated upon in the context of other whistleblower statutes. The Federal Circuit noted the following in a Whistleblower Protection Act case:
>
> > The words "a contributing factor" . . . mean *any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision*. This test is specifically intended to overrule existing case law, which requires a whistleblower to prove that his protected conduct was a "significant", "motivating", "substantial", or "predominant" factor in a personnel action in order to oveturn that action.
>
> Furthermore, an employee "*need not* demonstrate the existence of a retaliatory motive on the part of the employee taking the alleged prohibited personnel action in order to establish that his disclosure was a contributing factor to the personnel action."
>
> Once the employee asserts a prima facie case, the burden shifts to the employer to demonstrate, "by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of that behavior."  The "clear and convincing evidence" standard is the intermediate burden of proof, in between "a preponderance of the evidence" and "proof beyond

4

a reasonable doubt."  To meet the burden, the employer must show that "the truth of its factual contentions are highly probable."

*Araujo v. N.J. Transit Rail Operations, Inc.*, 708 F.3d 152, 158-59 (3d Cir. 2013) (citations omitted) (emphasis in original).  The court explained that this framework is intended to be difficult for the employer, because this effectuates the purposes of the safety statutes:

> It is worth emphasizing that the AIR-21 burden-shifting framework that is applicable to FRSA cases is much easier for a plaintiff to satisfy than the *McDonnell Douglas* standard. As the Eleventh Circuit noted in a case under the Energy Reorganization Act, a statute that uses a similar burden-shifting framework, "[f]or employers, this is a tough standard, and not by accident."  The Eleventh Circuit stated that the standard is "tough" because Congress intended for companies in the nuclear industry to "face a difficult time defending themselves," due to a history of whistleblower harassment and retaliation in the industry. The 2007 FRSA amendments must be similarly construed, due to the history surrounding their enactment.

*Id.*

Simply stated, Congress recognizes that unsafe trucks pose a significant danger to the public.  The Department of Transportation has issued voluminous regulations governing truck safety.  If a truck is unsafe, the driver is <u>expected</u> and in fact <u>required</u> to refuse to drive it.  If an employer fires a driver who refuses to drive an unsafe truck, it is the intent of the statute that the employer be held liable.  The law does not tolerate employers who coerce their drivers to take dangerous trucks onto the public roads.

C.   <u>FedEx Fired Mr. Briones After He Refused to Drive an Unsafe Truck That Violated DoT Regulations</u>.

While the parties dispute some of the facts relating to Mr. Briones' employment with FedEx, the <u>material</u> facts are not disputed.  There are collateral, non-material facts that are disputed.  For example, Mr. Briones claims that he had been singled out by Martha Coleman (the manager of the Harlingen facility) over a period of time because he opposed safety violations at

5

the facility.  FedEx disputes this and claims that Mr. Briones was a troublemaker.  None of these disputes are material to this motion.

Instead, this motion focuses on the specific events leading up to Mr. Briones' termination. The material facts about the termination are not disputed.

In the spring of 2016, FedEx assigned a new tractor to Mr. Briones.  The designation for the tractor was L-3968.  Almost immediately, Mr. Briones experienced problems with the blower in the truck.  He also experienced hostility from Ms. Coleman when he insisted that FedEx give him a different tractor.  She forced him to drive the tractor even though it was not in compliance with DoT regulations:

> Q.    (By Mr. Shivers) Mr. Briones, the – the tractor that you were driving in May of 2016 when you had your 10:00 a.m. start time was tractor number L-3968. Was there an issue with the ventilation blower on that tractor?
>
> . . . .
>
> A.    When I first got that truck, of course doing all our pre-trip I found that the -- that the blower was not working on that tractor.
>
> Q.    So the very first time --
>
> A.    The very first time.
>
> Q.    -- that you ever pre-tripped it?
>
> A.    Not the very first time that -- I think maybe week after I was driving around in it. The blower went out on it. I went and I -- and I talked to the mechanic and I told him that -- what was going on.
>
> . . . .
>
> Q.    Who was the mechanic?
>
> A.    Joe Ochoa.
>
> Q.    Okay.

A.     And I told him what was going on with the truck. <u>And I told him that the way the truck was, I couldn't take it out like that. It was a DOT violation. And he -- he said, okay, grab another truck. So I went to go talk to Gilbert Trevino. And I told him, hey, Gilbert, the truck on that -- the blower is not working; so can you get me another truck? And he says, yeah, go ahead and grab this other truck.</u> Okay. So I went outside, grabbed another truck, hooked up to the trailer, did my pre-trip. I came up to the front of the -- of the warehouse. I got off to get my – my paperwork.

<u>Ms. Coleman got -- found out that I had switched trucks and told me to change back to the truck I was driving. And I tried to explain to her that the truck that I had was in DOT violation, and she had -- she didn't have anything of it.</u> And I tried to tell Joe to back me up, but Joe wouldn't do it. And so I walked out. And I was -- nobody -- you know, I -- I was walking out and I was like, you know, I can't believe, that truck should be out of -- out of service. So then she called me back. She made me apologize to Joe Ochoa, which was the mechanic.

. . . .

Q.     All right. Tell -- before you move forward, what DOT regulation was violated by your taking that truck that day?

A.     It states in the DOT code -- I'm not a lawyer; so I don't know what the code is. But it states that every part of the equipment on the tractor should be working, including the air ventilation and defroster, should be working in those trucks. And at that time that wasn't working. There was no air at all coming out of the tractor.

Briones Dep. at 100-04 (excerpts are in the Appendix) (emphasis added).

FedEx repaired the blower on the tractor, but a few weeks later it broke yet again. This was the beginning of the sequence of events that led to Mr. Briones' termination. Mr. Briones explained that the blower worked on the "high" setting until Friday, May 20, 2016, when it broke down completely. This created a dangerous condition because the weather conditions were rainy:

A.     . . . Three or four weeks later the same thing started happening again. The blower -- I started having problems with the blower.

Q.     But it had been replaced?

A.     It had been replaced.

Q.     Okay.

7

A.      I don't know if it was the blower or if it was the switch they replaced, but I started having problems with it again. And the -- the blower was working. The air was ventilating on -- on high. You go one, two, three, and four; and four would be high. And it was working on high. So I -- he ordered the part for it again. And so I was -- I was driving the tractor with the air blowing high, which was fine.

Friday afternoon I took -- I took the tractor out Friday and I am driving with it. I got back in the tractor and they -- they called me that they needed me to go to Weslaco for another – another pick-up; so go leave the trailer that I have there at the yard, because I was in Harlingen. It started pouring rain. I went to turn on the tractor. The blower was completely out. No air was blowing out of the tractor, no air whatsoever. So I called the office.  I called Rick Weeks. I told him what was going on. He said, okay, well, come on in, grab another tractor and head back out to Weslaco.

Okay. Well, I'm driving to the yard and I have to roll down the window and stick my head out the window because I can't see nothing. The whole wind -- the whole windshield is -- well, you -- it's all fogged up. I can't see anything. So this is the way I'm driving back to the yard with my head out the window trying to make sure I don't hit anybody or -- or run into somebody. So I get to the yard, change the tractor, go to Weslaco, and that's the end of the day.

I -- before I got off the tractor I did write on my DVIR [Driver-Vehicle Inspection Report], blower not working, no air is coming out. And I emphasized it on the DVIR, which I know when we place it -- after we finish with that tractor, we're going to put that DVIR in the mailbox so the mechanic can read and see what's going on.

Briones Dep. at 104-06 (emphasis added).  This is confirmed by the DVIR (Appendix at 34).  The DVIR states "AC Blower is not working, No Air is coming out."  The DVIR is dated Friday, May 20, 2016, is signed by Mr. Briones, and specifies Unit L-6938.  Significantly, the DVIR also reflects that FedEx did not repair the blower until Tuesday, May 24, 2016.

On Monday, May 23, 2016, Mr. Briones arrived for work.  His tractor was not shown as out of service, so he assumed that it had been fixed.  But the blower was still inoperative, and the mechanic refused to put it out of service.  Having previously been ordered to apologize to the mechanic, Mr. Briones did not argue with him:

A.      Yeah. Monday comes around. There in the drivers' lounge there's a board where the mechanic, out of service trucks, he writes what tractors are out of service. I didn't see my tractor there on the board; so I'm assuming he might have fixed it already. So I go out to the -- I go out to the tractor. I turn it on. I see that the blower is still not working. So I drive my tractor over to the mechanic. . . .

. . . .

Q.      Okay. And so when you get to the tractor –

A.      Turn it on.

Q.      -- you tried it?

A.      Uh-huh, yes.

Q.      And you said it didn't work on high or any speed?

A.      It didn't work at any speed.

Q.      All right. And then what did you do then?

A.      So then I turned it on. I went over to – to where Joe was, the mechanic at the shop, or his little garage that he has there. And he was talking to George Prado, Jr. And I got off and I go, hey, Joe, did you order the part for the -- for the -- I'm sorry. Is the part for the tractor in yet? And he goes, no. And I go, can you put it out of service? And he said no. And that's where I left it. Because the last time that -- the first time I got into an argument with him about that, and I didn't want no -- I didn't want -- and so I said, fine.

Briones Dep. at 107-09.  Mr. Briones then went to the supervisors (Rick Weeks and Gilbert Trevino) and asked for a different tractor.  They refused to give him a new tractor, but Mr. Briones refused to drive the tractor with the broken blower:

A.      . . . I'll just -- I'll just go talk to Rick, since Rick is the one that gave me the tractor on Friday. You know, what's the big difference? You need another tractor. So, Rick, my tractor is not working, the blower is not working, and the part for the tractor is not in yet. Well, I need -- Rick told me, you need to talk to Gilbert. So I went to go talk to Gilbert. Gilbert, the blower in my tractor is not working. Have you spoken to Joe? Yes. Well, you have to take that tractor. It's not out of service. I said, I'm like, I can't take the tractor the way it is. It's -- it's -- it's -- I can't do that. It's -- you can't take it the way it is. It's a DOT violation.

So he didn't want to give me a tractor. He's refusing me to take a tractor. And then Rick is -- Rick is sitting like where you're at, and then his desk 1 <u>And I'm, Rick, can you help me out here, Rick? I mean, I -- I can't take that tractor the way it is. It's a DOT violation. Suppose it starts to rain again like it did on Friday. So then Gilbert says, well, it's not going to rain. And I turn around and I go, so what are you, the weatherman? You know, of course I was already frustrated. And then Rick says, no, we have to check the weather every day. I go -- and I looked at Gilbert and I said, oh, okay, I'm sorry. But I still can't take that tractor the way it is.</u>

Briones Dep. at 109-10 (emphasis added).  Weeks finally relented and assigned Mr. Briones a

different tractor:

 A. . . . So Gilbert is not going to give me the tractor. And in my head I'm assuming since Martha already got after him once for giving me a tractor, he's not going to do it again. So finally Rick just says, you know what, forget it, just -- Rick, just take this tractor. So he gave me another tractor to take.

 Q. Okay. So Rick was the person who told you to take a different tractor?

 A. Correct. Because Gilbert was not going to budge. He was not going to give me another tractor.

Briones Dep. at 110-11.

This should have been the end of the matter, but of course it was not.  When Mr. Briones

came to work on Tuesday, May 24, 2016, Ms. Coleman was waiting for him.  She told him that he

would be written up for refusing to drive the truck:

 Q. And then you came back the next day –

 A. Yes, sir.

 Q. -- and worked?

 A. Actually, I walked in and Martha was waiting for me.

 . . . .

 Q. All right. And what happened in that meeting?

 A. <u>She started telling me that I shouldn't have taken the tractor that I did, that I caused a big ruckus in the office, and that I should have taken the tractor</u>

10

<u>that I was assigned to and that I was going to get written up.</u> And I said I was -- I didn't agree with what she said. But as I opened the door to leave, she was taunting me. Go ahead and call the -- go call the managers or go call the supervisor -- I forgot the big -- not the guys upstairs, but the upper management. Because she already knew that that's who I would call.

Briones Dep. at 118-19 (emphasis added).   Mr. Briones proceeded to talk to FedEx's safety

director, who agreed that he should not have driven the truck.   He also called Irene French from

HR.  Ms. French told him that they would meet on Wednesday, May 25, 2016:

> A.      But I did call Joe Vargas, which is our safety director up in Dallas. I did tell him what was going on, that I was going to get written up because I took a trac -- they wanted me to take a tractor that the blower was out. <u>And Joe Vargas said to me that in no way or manner are you supposed to take that tractor out onto the road.</u> I will call Ms. Coleman and I will let her know that she's not to write you up because you did the right thing. So after I hung up with Joe Vargas, I - I called Ms. Irene and I told her what was going on. And I told her that -- and she said, you know, we can talk in person because I'm going to be there at the terminal on Wednesday. So we can talk. You can come in the office and we'll talk.

> Q.      All right. So you called Joe Vargas and then you called Irene French?

> A.      (Nodded.)

> Q.      And she said she was going to be there the next day, Wednesday?

> A.      Correct.

Briones Dep. at 121-22 (emphasis added).   Mr. Briones did meet with Ms. French on Wednesday.

Immediately afterwards, Ms. Coleman suspended him.   A few later, she fired him:

> Q.      All right. And what happened in that meeting?

> A.      I just told her everything that was going on.  I just told her that I felt that I was being targeted to get fired. I -- I told her that I feel -- I'm already anxiety and depression. And I told her everything that she'd been doing to me and that -- and Irene said, okay, we'll take care of it. And I thought I was going to get helped. And the next thing I know I'm going into Ms. -- into Martha's office. And she tells me, give me your keys. Give me your badge. And you're gone. You're suspended.

> Q.     Suspended. Okay.

> A. And then she called me four days later and -- I finally got rid of you. You're gone. You're fired.

Briones Dep. at 124.

Mr. Briones' version of the facts is essentially confirmed by the other FedEx employees.

Ms. Coleman apparently directed Weeks and Trevino to write statements.  Weeks wrote:

> Yesterday as I walked into the office I noticed Mr. Briones standing in front of Gilbert Trevino Desk asking him about the tractor L3968 assigned to him daily, stating the blower on the tractor don't work and that Joe the shop supervisor has the part on order and he needed a different tractor if it rains he won't be able to see because it will fog up the windshield.

> Gilbert Trevino explained to Mr. Briones that its not suppose to be raining today and when Gilbert Trevino told Mr. Briones this became very loud stating Oh now your doing the Forecast (weather) In the office very Loud where other's in the office over hearing Rick Briones getting upset and Very loud with Gilbert Trevino.

> I Rick Weeks Supervisor Heard the statement made By Rick Briones to Gilbert Trevino so I step Into the Conversation & Explain In Detail to Rick Briones That Yes this IS part of our Job Daily to report on the weather each and everyday, I Tried to Diffuse the Conversation and to help lower Rick Briones tone of voice.

Appendix at 35.  Gilbert Trevino gave a similar account of the incident:

> At that time Rick Briones started raising his voice at me in front of the whole office saying "Well what about the drivers, now your putting our safety at risk" I replied Rick I just confirmed with Joe Ochoa in front of you and he stated tractor L3968 is working and safe to drive. Rick Briones continued to argue back and fourth with me about taking another tractor while continuing to raise his voice. I tried to calm Rick Briones down but the more I tried to calm him the more upset he would get.

> Rick Briones stated he was concerned because the blower was NOT working, that if it rained, the windows would fog up & this would become a safety issue. I Informed Rick Briones that there is not rain in the forecast. Rick responded sarcastically & loud by saying "Oh, so now you're the forecaster?" As leadership, I kept my composure and remained professional. Rick disrupted the office, speaking loudly while an office associate was on the phone with a customer.

Appendix at 36.  Ms. Coleman also obtained statements from two office workers, who said that

Mr. Briones was "loud" and "rude," but who also confirmed that Mr. Briones was complaining

12

about an equipment issue.  Appendix at 37-38.  Ms. Coleman summarized all of this information and recommended that Mr. Briones be terminated for insubordination and disruptive conduct. Appendix at 39-40.

The Court should note what is <u>missing</u> from these statements.  FedEx's supervisors claim that Mr. Briones raised his voice, but not that he yelled or shouted.  They do not claim that he used profane language.  They do not claim that he did anything violent or threatening.  The only "rudeness" was the "Are you a weatherman?" comment, which is trivial.  The portrait painted by these statements is a driver who was (justifiably) angry that he was being ordered to driver a truck that violated DoT regulations and that posed a potential safety risk.  Ms. Coleman wanted Mr. Briones to be obedient and submissive, but he refused to violate the law.

For purposes of this motion, the Court may take FedEx's statements at face value.  Even taking the statements at face value, there is no dispute that FedEx fired Mr. Briones after he refused to drive an unsafe truck that violated DoT regulations.  FedEx fired him because of the <u>manner</u> of his refusal to drive the truck, not due to some unrelated violation of workplace rules.

The remaining issue is whether the manner of the refusal (being "loud" and "rude") is enough to justify Mr. Briones' termination.  In other words, did the supposed loudness (which Mr. Briones disputes) remove Mr. Briones' conduct from the protection of the STAA?

D.     <u>Even If Mr. Briones Was "Loud" and "Rude," His Conduct Remained Protected by the Surface Transportation Assistance Act Because It Was Not "Opprobrious."</u>

The STAA does not require a driver to be polite and courteous in refusing to drive an unsafe truck.  In fact, if any employer orders a driver to take a truck that is a danger to the driver and to the public, it is entirely reasonable to expect the driver to become upset.  In fact, public policy would expect a driver to be forceful in refusing to drive a truck that would endanger the public and the driver.  This does not strip the driver's conduct from the protection of the STAA.

We are not aware of any case law addressing this sort of behavior in the specific context of the STAA. However, this precise issue arises commonly in the context of labor-management disputes decided by the NLRB.  To resolve these issues, the NLRB applies the *Atlantic Steel* test to determine whether the employee's conduct was "opprobrious":

> [T]he Board and the courts have recognized . . . that even an employee who is engaged in concerted protected activity can, by opprobrious conduct, lose the protection of the Act.
>
> The decision as to whether the employee has crossed that line depends on several factors: (1) the place of the discussion; (2) the subject matter of the discussion: (3) the nature of the employee's outburst; and (4) whether the outburst was, in any way, provoked by an employer's unfair labor practice.

Appendix at 41 (copy of *Atlantic Steel,* 245 NLRB 814 (1979)); Appendix at 49 (copy of *Plaza Auto Center*, 355 NLRB 493 (2010)).  As the Seventh Circuit explained:

> As other cases have made clear, flagrant conduct of an employee, even though occurring in the course of section 7 activity, may justify disciplinary action by the employer. On the other hand, not every impropriety committed during such activity places the employee beyond the protective shield of the act. The employee's right to engage in concerted activity may permit some leeway for impulsive behavior, which must be balanced against the employer's right to maintain order and respect.

*NLRB v. Thor Power Tool Co.*, 351 F.2d 584, 587 (7th Cir. 1965); *see Boaz Spinning Co. v. NLRB*, 395 F.2d 512, 514 (5th Cir. 1968) (quoting *Thor Power Tool* and stating "Unquestionably, Alexander was insubordinate; however, it seems equally clear that his short speech, although intemperate, was of a pro-union character. Thus, as a union activist making a pro-union speech, he can avail himself of the protective shield of section 7 so long as his insubordination was not so flagrant as to take him beyond the pale."); *Mobil Exploration & Producing U.S., Inc. v. NLRB*, 200 F.3d 230, 242-43 (5th Cir. 1999).  While these cases did not arise under the STAA or AIR 21, the *Atlantic Steel* framework is a logical way to analyze employee behavior under those statutes.

Applying this framework, each of the four factors from *Atlantic Steel* weighs in favor of continued protection for Mr. Briones' conduct:

(1)  The place of the conduct was the office, not out in the workplace where the other drivers could become embroiled.  There was no other logical place where Mr. Briones could have raised his issues.  *Plaza Auto Center*, 355 NLRB at 494 ("With respect to the first factor, the place of the discussion, the meeting took place in Felix's office, in the presence of only management officials.").

(2)  The subject matter was Mr. Briones' refusal to drive a truck in violation of DoT regulations.  *Id.* ("As to the second factor, the subject matter of the discussion, the discussion involved Aguirre's protected concerted activity of raising questions about terms and conditions of employment, particularly the Respondent's policies pertaining to breaks and compensation."),

(3)  The nature of the conduct may have been "loud" or "rude" (though Mr. Briones denies this), but there is no claim that Mr. Briones was profane, violent, or threatening.  *Id.* at 495 ("The Board has found that communications in the course of protected activity are also protected unless they are 'so violent or of such serious character as to render the employee unfit for further service.'").  In *Plaza Auto Center*, the NLRB upheld protection for an employee who dropped the "F bomb" on his supervisor ("Aguirre became upset and told Plaza that he was an "F'ing mother F'ing," an "F'ing crook," and "an asshole," and that he was stupid, nobody liked him, and everyone talked about him behind his back. At one point, Aguirre stood up in the small office, pushed his chair aside, and said that, if he was fired, Plaza would regret it.").  Mr. Briones' conduct – even as described by FedEx – does

15

not come close to that that level.  At most, he may have raised his voice and make a sarcastic comment about Trevino being a weatherman.  This is not opprobrious and does not override the public policy of the STAA.

(4)     FedEx provoked the conduct by ordering Mr. Briones to drive a truck that violated DoT regulations.  Mr. Briones was being ordered to violate the law and to place himself and the public in danger.  This justifies some degree of "loudness" and "rudeness."  *Id.* at 494 ("Finally, with regard to the fourth factor, whether the employee was provoked, at least twice during the meeting, the Respondent reiterated to Aguirre its frequent warning that if he did not like the Respondent's policies he did not need to work there.  The judge found, and we agree, that these statements were unlawful and provocative responses to Aguirre's inquiries.").

Accordingly, under the *Atlantic Steel* analysis, Mr. Briones' conduct was not "opprobrious" and remained protected even if he was "loud" and "rude."

Again, this is not a Title VII case.  The employer does not get the benefit of the doubt.  If an employee refuses to drive a truck because of safety issues, the employer cannot avoid liability by arguing that the driver was not obedient and submissive.  Yet that is precisely what FedEx wishes to do.  Mr. Briones refused to violate the law, and he did not allow FedEx to bully him into driving a dangerous truck.  FedEx fired Mr. Briones because he refused to obey and stood up to his supervisors.  In doing so, FedEx violated the STAA.

II.     FedEx Is Liable as a Matter of Law.

The Fifth Circuit identified four elements to an AIR-21 claim: "To prevail, an employee must prove by a preponderance of the evidence  that (1) she engaged in protected activity; (2) the employer knew that she engaged in the protected activity;  (3) she suffered an unfavorable

16

personnel action; and (4) the protected activity was a contributing factor in the unfavorable action." *Allen*, 514 F.3d at 475-76.  Each of those elements are present.

First, Mr. Briones engaged in protected activity.  He refused to drive a truck because the operation of the truck would have violated DoT regulations.  49 CFR §§ 393.79, 396.2(a)(1),571.103.  Unlike the mechanic and the supervisors, Mr. Briones had actually examined the truck and found that the blower did not work.  On Friday afternoon, FedEx gave him a different truck when he reported the problem.  On Monday, FedEx refused to do so, even though the problem was not yet fixed.  FedEx did not repair the blower until Tuesday.  When Mr. Briones refused to drive the truck, this was protected activity under 49 U.S.C. § 31105(a)(1)(B)(i).

Additionally, given that Mr. Briones had driven the truck on Friday with his head out of the window, Mr. Briones had "a reasonable apprehension of serious injury to the employee or the public."  49 U.S.C. § 31105(a)(1)(B)(ii).  FedEx suggests that it might not have rained that day, but that is just a reflection of FedEx's indifferent attitude toward safety.  It could have rained, or the humidity could have caused the windows to fog even without rain.  If anything happened that caused the windows to fog, Mr. Briones would have been driving blind.  This was a dangerous vehicle, and yet FedEx was willing to send it out onto the public roads because it hoped that the windows would not fog.

Second, FedEx indisputably knew about the protected activity.  In fact, this is reflected in the statements written by the FedEx employees.

Third, Mr. Briones suffered an unfavorable personnel action.  He was fired.

Fourth, the protected activity was a contributing factor in the unfavorable action.  Mr. Briones was fired when he refused to drive the truck, and his conduct was not so opprobrious as to strip his conduct of legal protection.

Mr. Briones' has thus established his case as a matter of law.  Normally, the burden would shift to FedEx to prove by clear and convincing evidence that it would have taken the same action in the absence of the protected activity.  In this case, however, FedEx has offered no justification for firing Mr. Briones other than the protected activity.  Given that the conduct was not so opprobrious as to lose legal protection, FedEx has no further defense.

Accordingly, FedEx is liable as a matter of law.  The Court should grant summary judgment in favor of Mr. Briones as to liability.

III.    Affirmative Defenses 4, 8, 9, 10, and 11 Are Without Merit.

Most of FedEx's affirmative defenses are either boilerplate (for example, failure to state a claim upon which relief can be granted) or inapplicable Title VII defenses (for example, that there are legitimate, non-discriminatory reasons for the termination).  However, five of the affirmative defenses are actually relevant to the claims in this case.  Mr. Briones propounded interrogatories directed to these defenses.  In each case, FedEx responded with "Defendant would show that discovery is ongoing and will supplement with any specific evidence discovered."  Appendix at 65-66 (Interrogatory Nos. 5-9).  FedEx never supplemented.  It is now time to weed out these extraneous defenses.

A.    Mitigation of Damages (Affirmative Defense 4)

With respect to mitigation of damages, the burden is on the employer to prove that (1) substantially equivalent work was available; and (2) the former employee did not exercise reasonable diligence to obtain it.  *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 393 (5th Cir. 2003).  "Substantially equivalent employment is that employment which affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status as

the position from which the [former employee] has been discriminatorily terminated." *Id.* (internal quotation omitted).

Mr. Briones testified at length about his efforts to find new employment.  Briones Dep. at 144-50.  Mr. Briones also produced documents reflecting his job search.  FedEx has offered no evidence that substantially equivalent work was available or that Mr. Briones did not exercise reasonable diligence to find it.  The Court should grant summary judgment with respect to this defense.[2]

B.      Administrative Requirements (Affirmative Defenses 8, 9, and 11)

FedEx claims that the suit is barred by the statute of limitations, that Mr. Briones failed to exhaust his administrative remedies, and that Mr. Briones failed to bring his claim within six months, as required by his employment application.  The STAA required Mr. Briones to file a complaint with OSHA within 180 days of the adverse action, 49 U.S.C. § 31105(b)(1), and then permitted him to file a lawsuit if OSHA failed to act within 210 days, 49 U.S.C. § 31105(c).  Mr. Briones filed his complaint with OSHA on June 30, 2016, which is within 180 days (or six months) of the adverse action.  Appendix at 67.  After 210 days had passed, Mr. Briones filed this lawsuit on February 7, 2017.  Doc. 1.

Mr. Briones brought his claims on a timely basis and exhausted his administrative remedies.  These defenses are frivolous, and the Court should grant summary judgment.

---

[2]      Affirmative Defense 4 also alleges that Mr. Briones' claims are subject to damage caps.  In the interrogatory answer, FedEx claims that there is a $250,000.00 damages cap under the STAA. This is not correct.  There is a $250,000.00 cap on punitive damages, 49 U.S.C. § 31105(b)(3)(C), but otherwise damages are uncapped.  The Court need not address the application of that cap unless and until the jury awards punitive damages.

C.    <u>After-Acquired Evidence (Affirmative Defense 10)</u>

Affirmative Defense 10 asserts that Mr. Briones' claim may be barred by the after-acquired evidence doctrine.  FedEx has identified no after-acquired evidence.  The Court should grant summary judgment as to this defense.

IV.    <u>Conclusion</u>

The law demands that companies like FedEx operate their trucks safely, to avoid endangering the public and its own employees.  Mr. Briones took the law seriously.  He refused to drive a truck that did not comply with DoT safety regulations and that posed a tangible safety risk. He had already been forced to drive the truck with his head out of the window.

FedEx and its manager, Martha Coleman, were more interested in obedience than safety. When Mr. Briones was disobedient, FedEx fired him.

In fact, FedEx essentially confesses liability.  It argues that Mr. Briones was "loud" and "rude" in refusing to drive an unsafe truck.  Given that FedEx was attempting to send a dangerous truck onto the public roads, then Mr. Briones <u>should</u> have been loud.  The law did not require Mr. Briones to be obedient and submissive.  The law expected Mr. Briones to refuse to put the public at risk.  The law protected Mr. Briones from retaliation, and yet that is precisely what happened.

FedEx cavalierly ignored its obligations under the law and to the public.  The Court should grant summary judgment as to liability.

20

Respectfully submitted,

/s/ David C. Holmes
David C. Holmes, Attorney in Charge
State Bar No. 09907150
13201 Northwest Freeway, Suite 800
Houston, Texas 77040
Telephone: 713-586-8862
Fax: 713-586-8863
dholmes282@aol.com

ATTORNEY FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this pleading was sent electronically to all counsel of record on May 29, 2018.

/s/ David C. Holmes
David C. Holmes

21