IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

RICARDO BRIONES,                §
                                §
        Plaintiff,              §
                                §        NO. 1:17cv29
vs.                             §
                                §        JURY TRIAL DEMANDED
FEDEX FREIGHT, INC.,            §
                                §
        Defendant.              §

## APPENDIX

## TO

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY AND CERTAIN AFFIRMATIVE DEFENSES

```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
                  BROWNSVILLE DIVISION

RICARDO BRIONES              )(
                             )(  CIVIL ACTION NO.
VS.                          )(   1:17-CV-00029
                             )(
FEDEX FREIGHT, INC.          )(
```

*********************************************************

ORAL VIDEOTAPED DEPOSITION OF

RICARDO BRIONES

April 4, 2018

*********************************************************


        ORAL VIDEOTAPED DEPOSITION OF RICARDO BRIONES,

produced as a witness at the instance of the Defendant,

and duly sworn, was taken in the above-styled and

numbered cause on April 4, 2018, from 9:05 a.m. to 2:26

p.m., before EVELYN M. AGUILAR, CSR in and for the State

of Texas, reported by stenograph, at Atlas, Hall &

Rodriguez, LLP, 50 West Morrison Road, Suite A,

Brownsville, Cameron County, Texas, pursuant to the

Federal Rules of Civil Procedure and the provisions

stated on the record or attached herein.

1    tripped that limit?

2        A.    Yes, sir.

3        Q.    All right.  And that's your signature there

4    on it?

5        A.    Yes, sir.

6        Q.    The date is May 18, 2016?

7        A.    Yes, sir.

8              MR. SHIVERS:  Okay.  We've been going a

9    little while now.  Let's -- let's take a five-minute

10   break.

11             THE WITNESS:  Okay.

12             THE VIDEOGRAPHER:  Okay.  Off record,

13   11:07 a.m.

14             (Recess taken.)

15             THE VIDEOGRAPHER:  Okay.  Back on record,

16   11:16 a.m.

17       Q.    (By Mr. Shivers)  Mr. Briones, the -- the

18   tractor that you were driving in May of 2016 when you

19   had your 10:00 a.m. start time was tractor number

20   L-3968.  Was there an issue with the ventilation blower

21   on that tractor?

22       A.    The first time or the second time?

23       Q.    Well, let's talk about every time.

24       A.    Okay.  Well, let me start from the beginning,

25   then.

1      Q.    All right.

2      A.    When I first got that truck, of course doing

3  all our pre-trip I found that the -- that the blower was

4  not working on that tractor.

5      Q.    So the very first time --

6      A.    The very first time.

7      Q.    -- that you ever pre-tripped it?

8      A.    Not the very first time that -- I think maybe

9  a week after I was driving around in it.  The blower

10  went out on it.  I went and I -- and I talked to the

11  mechanic and I told him that -- what was going on.  Let

12  me point something out to you real quick.

13              MR. HOLMES:  Again, make sure you're

14  answering the question.  Let's -- let's -- let's try and

15  finish today.

16              THE WITNESS:  Okay.

17      Q.    (By Mr. Shivers)  All right.  So you -- a

18  week or so after you got this particular tractor, the

19  city tractor --

20      A.    Right.

21      Q.    -- you say you noticed that the blower --

22      A.    Wasn't working.

23      Q.    -- was not working?

24      A.    Right.  So I went in and I -- and I spoke to

25  the mechanic.  And I --

1        Q.    Who was the mechanic?

2        A.    Joe Ochoa.

3        Q.    Okay.

4        A.    And I told him what was going on with the

5    truck.  And I told him that the way the truck was, I

6    couldn't take it out like that.  It was a DOT violation.

7    And he -- he said, okay, grab another truck.  So I went

8    to go talk to Gilbert Trevino.  And I told him, hey,

9    Gilbert, the truck on that -- the blower is not working;

10   so can you get me another truck?  And he says, yeah, go

11   ahead and grab this other truck.  Okay.  So I went

12   outside, grabbed another truck, hooked up to the

13   trailer, did my pre-trip.  I came up to the front of the

14   -- of the warehouse.  I got off to get my -- my

15   paperwork.

16             Ms. Coleman got -- found out that I had

17   switched trucks and told me to change back to the truck

18   I was driving.  And I tried to explain to her that the

19   truck that I had was in DOT violation, and she had --

20   she didn't have anything of it.  And I tried to tell Joe

21   to back me up, but Joe wouldn't do it.  And so I walked

22   out.  And I was -- nobody -- you know, I -- I was

23   walking out and I was like, you know, I can't believe,

24   that truck should be out of -- out of service.  So then

25   she called me back.  She made me apologize to Joe Ochoa,

1   which was the mechanic.  And she made me switch the

2   tractor back to the tractor that I had with the blower

3   that was no good.  And a witness, Paul Garcia, was there

4   parked behind me watching me change that tractor back to

5   the old field tractor that I had.

6        Q.    Who was the witness?

7        A.    Paul Garcia, Paul --

8        Q.    Paul?

9        A.    -- Garcia.  Because he had asked me earlier

10  that day what had happened.  I told him.  He said, yeah,

11  that's going to -- refer to change that tractor.  That

12  tractor shouldn't have been out -- shouldn't be out.

13  And as a matter of fact, I took it out.  So he ordered

14  the part for it and got the tractor fixed.  About --

15       Q.    He being Joe?

16       A.    Joe, yes.

17       Q.    So what you had to apologize for was for

18  saying that it should have been taken out of service?

19       A.    Yeah.  Like -- like he should have backed me

20  up.  You know, he should have said, yeah, he's right and

21  you're wrong.  But, anyway, so --

22       Q.    And then so Paul Garcia saw you switch back

23  --

24       A.    Back.

25       Q.    -- to L-3968?

1      A.     Correct.  And I took that tractor back.

2      Q.     And you took it?

3      A.     And I took it.

4      Q.     All right.  Tell -- before you move forward,

5   what DOT regulation was violated by your taking that

6   truck that day?

7      A.     It states in the DOT code -- I'm not a

8   lawyer; so I don't know what the code is.  But it states

9   that every part of the equipment on the tractor should

10  be working, including the air ventilation and defroster,

11  should be working in those trucks.  And at that time

12  that wasn't working.  There was no air at all coming out

13  of the tractor.  So I'm not really sure.  Three or four

14  weeks later the same thing started happening again.  The

15  blower -- I started having problems with the blower.

16     Q.     But it had been replaced?

17     A.     It had been replaced.

18     Q.     Okay.

19     A.     I don't know if it was the blower or if it

20  was the switch they replaced, but I started having

21  problems with it again.  And the -- the blower was

22  working.  The air was ventilating on -- on high.  You go

23  one, two, three, and four; and four would be high.  And

24  it was working on high.  So I -- he ordered the part for

25  it again.  And so I was -- I was driving the tractor

1   with the air blowing high, which was fine.

2              Friday afternoon I took -- I took the

3   tractor out Friday and I am driving with it.  I got back

4   in the tractor and they -- they called me that they

5   needed me to go to Weslaco for another -- another

6   pick-up; so go leave the trailer that I have there at

7   the yard, because I was in Harlingen.  It started

8   pouring rain.  I went to turn on the tractor.  The

9   blower was completely out.  No air was blowing out of

10  the tractor, no air whatsoever.  So I called the office.

11  I called Rick Weeks.  I told him what was going on.  He

12  said, okay, well, come on in, grab another tractor and

13  head back out to Weslaco.

14              Okay.  Well, I'm driving to the yard and

15  I have to roll down the window and stick my head out the

16  window because I can't see nothing.  The whole wind --

17  the whole windshield is -- well, you -- it's all fogged

18  up.  I can't see anything.  So this is the way I'm

19  driving back to the yard with my head out the window

20  trying to make sure I don't hit anybody or -- or run in

21  to somebody.  So I get to the yard, change the tractor,

22  go to Weslaco, and that's the end of the day.

23              I -- before I got off the tractor I did

24  write on my DVIR, blower not working, no air is coming

25  out.  And I emphasized it on the DVIR, which I know when

1    we place it -- after we finish with that tractor, we're

2    going to put that DVIR in the mailbox so the mechanic

3    can read and see what's going on.

4         Q.    Where is the mailbox?

5         A.    It's over there by where the mechanics do

6    their work.

7         Q.    Okay.  So you filled out a DVIR, driver

8    vehicle inspection report?

9         A.    Right.

10        Q.    And you took it to a designated place, a

11   mailbox?

12        A.    Correct.

13        Q.    In the shop, or where is it?

14        A.    Yeah.  It's there in the shop.

15        Q.    It's out in the shop?

16        A.    Yes.

17        Q.    All right.  And what time of day was this?

18        A.    It was already after -- about 5:00 o'clock.

19        Q.    Okay.  Was there anyone in the shop?

20        A.    No.

21        Q.    And this was a Friday afternoon?

22        A.    Correct.  And Rick -- like I said, Rick gave

23   me another tractor to take and I took it.

24        Q.    Okay.  So you took the other tractor, made

25   the other run, brought that tractor back, and left for

1    the day?

2         A.    Yeah.  Monday comes around.  There in the

3    drivers' lounge there's a board where the mechanic, out

4    of service trucks, he writes what tractors are out of

5    service.  I didn't see my tractor there on the board; so

6    I'm assuming he might have fixed it already.  So I go

7    out to the -- I go out to the tractor.  I turn it on.  I

8    see that the blower is still not working.  So I drive my

9    tractor over to the mechanic.  And at this point George

10   Prado, Jr. is there talking to Joe.  George Prado, Jr.

11   is talking to George -- I mean, to Joe, the mechanic.

12        Q.    George --

13        A.    George Prado.

14        Q.    Spell that for me.

15        A.    Prado, P --

16              MS. FRENCH:  P-r-a-d-o.

17        Q.    (By Mr. Shivers)  Ah, okay.  I'm sorry.

18        A.    Jr.  Because his dad works there, too.  So

19   he's Jr.

20        Q.    All right.  So you say there's a board in the

21   drivers' room with all the tractors listed on it?

22        A.    For out of service, that are out of service.

23        Q.    Only the ones that are out of service are

24   listed?

25        A.    Correct.  And mine wasn't there.

1      Q.    Okay.  And so this is even before the

2    pre-shift meeting, or when does this -- when did you

3    look at the board?

4      A.    This is after the pre-shift meeting.

5      Q.    After the pre-shift meeting?

6      A.    Right, yeah.

7      Q.    All right.  So you showed up, you sit through

8    the pre-shift meeting, and you get your paperwork?

9      A.    Yeah.  Because I need to go to my tractor.

10     Q.    And then but you look on the board and it's

11   not showing out of service?

12     A.    Right.

13     Q.    So you go to the tractor?

14     A.    Correct.  Because I'm assuming it's already

15   fixed since it wasn't on the board.

16     Q.    Okay.  And so when you get to the tractor --

17     A.    Turn it on.

18     Q.    -- you tried it?

19     A.    Uh-huh, yes.

20     Q.    And you said it didn't work on high or any

21   speed?

22     A.    It didn't work at any speed.

23     Q.    All right.  And then what did you do then?

24     A.    So then I turned it on.  I went over to -- to

25   where Joe was, the mechanic at the shop, or his little

1  garage that he has there.  And he was talking to George

2  Prado, Jr.  And I got off and I go, hey, Joe, did you

3  order the part for the -- for the -- I'm sorry.  Is the

4  part for the tractor in yet?  And he goes, no.  And I

5  go, can you put it out of service?  And he said no.  And

6  that's where I left it.  Because the last time that --

7  the first time I got into an argument with him about

8  that, and I didn't want no -- I didn't want -- and so I

9  said, fine.

10         I'll just -- I'll just go talk to Rick,

11  since Rick is the one that gave me the tractor on

12  Friday.  You know, what's the big difference?  You need

13  another tractor.  So, Rick, my tractor is not working,

14  the blower is not working, and the part for the tractor

15  is not in yet.  Well, I need -- Rick told me, you need

16  to talk to Gilbert.  So I went to go talk to Gilbert.

17  Gilbert, the blower in my tractor is not working.  Have

18  you spoken to Joe?  Yes.  Well, you have to take that

19  tractor.  It's not out of service.  I said, I'm like, I

20  can't take the tractor the way it is.  It's -- it's --

21  it's -- I can't do that.  It's -- you can't take it the

22  way it is.  It's a DOT violation.

23         So he didn't want to give me a tractor.

24  He's refusing me to take a tractor.  And then Rick is --

25  Rick is sitting like where you're at, and then his desk.

1   And I'm, Rick, can you help me out here, Rick?  I mean,

2   I -- I can't take that tractor the way it is.  It's a

3   DOT violation.  Suppose it starts to rain again like it

4   did on Friday.  So then Gilbert says, well, it's not

5   going to rain.  And I turn around and I go, so what are

6   you, the weatherman?  You know, of course I was already

7   frustrated.  And then Rick says, no, we have to check

8   the weather every day.  I go -- and I looked at Gilbert

9   and I said, oh, okay, I'm sorry.  But I still can't take

10  that tractor the way it is.

11            So Gilbert is not going to give me the

12  tractor.  And in my head I'm assuming since Martha

13  already got after him once for giving me a tractor, he's

14  not going to do it again.  So finally Rick just says,

15  you know what, forget it, just -- Rick, just take this

16  tractor.  So he gave me another tractor to take.

17       Q.    Okay.  So Rick was the person who told you to

18  take a different tractor?

19       A.    Correct.  Because Gilbert was not going to

20  budge.  He was not going to give me another tractor.

21  And I wasn't about to take another tractor back out.

22       Q.    All right.  Let me back up a little bit.

23       A.    Uh-huh.

24       Q.    Help me understand where all this is taking

25  place.

1       A.      Oh, I'm sorry.

2       Q.      I mean, I've been -- I've been -- I've been

3   in the service center before.  And I know you walk in a

4   door, and there's a desk around the corner on the right

5   and a desk around the corner on the left.  And then

6   there's some cubicles down the middle and then the

7   drivers' room is off on the right.  And the city

8   dispatcher I think sits over there somewhere on that

9   right side --

10      A.      Correct.

11      Q.      -- correct?

12      A.      Correct.

13      Q.      It's my understanding that Gilbert's desk at

14  that time was in that corner on the left-hand side of

15  the front door.  Is that right?

16      A.      Yeah.  As soon as you come in, his desk is

17  right there.

18      Q.      You go -- you come in the front door and you

19  make a sharp left turn --

20      A.      And his desk is right there.

21      Q.      -- and his desk is there.  All right.  And so

22  he was sitting there.  You walked in and had a

23  conversation with him about the truck there, right?

24      A.      Uh-huh, correct.

25      Q.      And where was Rick Weeks at the time?

1     A.    As you walk in his -- Gilbert's desk sits

2  right here on the -- on the left.

3     Q.    Correct.

4     A.    And right here on the right where that

5  cubicle starts right there, his desk is right there.

6  He's sitting in that desk right there.

7     Q.    All right.  He was in the first cubicle?

8     A.    He was in the first desk.  It's not in the

9  cubicle.  It's a desk that's sort of right there facing

10  the front door.

11     Q.    Okay.

12     A.    So I'm like -- Gilbert is right here and Rick

13  is like right there where Irene is at.

14     Q.    Tell me, were you talking, what --

15     A.    So I'm in between --

16     Q.    -- ten feet?

17     A.    -- I'm in between -- I'm in between both of

18  them.  And of course --

19     Q.    Now, let me ask you --

20          MR. HOLMES:  You really need to slow

21  down.

22     Q.    (By Mr. Shivers)  Slow -- slow down.  Yeah.

23  Slow down here.  All right.  So the distance between

24  Gilbert's desk and where Rick Weeks was sitting is --

25  what would you estimate that to be?  Ten feet?  Twenty

1    feet?

2         A.    If I'm sitting here and Irene is right there,

3    that would be I would say, what, about eight feet?

4         Q.    Okay.  I'm just asking --

5         A.    Right.  Because I'm not --

6         Q.    -- for your best estimate --

7         A.    -- I'm not --

8         Q.    -- whatever it is.

9         A.    -- I'm not --

10        Q.    Just your best estimate.  I understand.  My

11   --

12               MR. HOLMES:  Please don't talk over him

13   so much.

14               THE WITNESS:  Sorry.

15        Q.    (By Mr. Shivers)  All right.  So you're there

16   talking to Gilbert?

17        A.    Yes.

18        Q.    But Rick is sitting at a desk?

19        A.    Yes.

20        Q.    Close by?

21        A.    Yes.

22        Q.    All right.  But you had not spoken to Rick.

23   Well, you had -- you had spoken to Rick, right?

24        A.    Uh-huh, yes.

25        Q.    You asked Rick to get another tractor, and he

1    said you need to go see Gilbert?

2         A.    Yes.

3         Q.    So then you walk over to Gilbert and you had

4    the conversation you've described.  And at some point

5    there was this thing about the weather; and you said, so

6    you're a weather forecaster now.  And at this point then

7    Weeks, who had not been a party to the conversation,

8    steps in and says, yes, we do check the weather?

9         A.    That's correct.

10        Q.    All right.  And then did you continue to

11   stand there with Gilbert, or did you walk away after --

12        A.    No.  I stand there with Gilbert, yes.

13        Q.    All right.  And then at what point did Rick

14   Weeks tell you you could take a different tractor?

15        A.    I guess he saw that Gilbert wasn't going to

16   give me a tractor, and he saw that I was already

17   frustrated because nobody wanted to listen to me.  You

18   know, the mechanic, supervisor, nobody wanted to listen

19   to me about the rules and regulations.  So Rick saw me

20   that I was -- I'm getting frustrated.  And at this -- at

21   this point and juncture you've got George Prado, Jr.

22   sitting at the window where you -- where you get your

23   bills listening to everything that's going on.  So he

24   knows there's no yelling or I'm being destructive or

25   being all this that they said.

1          MR. HOLMES:  Would you just answer the

2    questions?

3          THE WITNESS:  Oh, yes.  Sorry.

4     Q.    (By Mr. Shivers)  All right.   So George

5    Prado, Jr. was sitting over at that window to the

6    drivers' room.  All right.  And so you know that when

7    this was happening Gilbert Trevino was there.  You were

8    talking to him.  Rick Weeks was several feet away.  And

9    George Prado, Jr. was sitting over at the window.  Was

10   there anyone else in the office at the time?

11    A.    We had the secretary.

12    Q.    What was her name?

13    A.    Honestly, I don't remember what her name is.

14    Q.    Was she sitting in the desk on the right-hand

15   side of the front door?

16    A.    Yes.

17    Q.    Mari?

18    A.    Mari.

19    Q.    Okay.  Anyone else in the office to your

20   knowledge?

21    A.    I was more concentrating on -- on Gilbert and

22   Rick than I was anything else around the office.  So I'm

23   assuming the two -- I know there was two more

24   secretaries there, but I'm not really sure what their

25   names were.

APPENDIX 017

```
 1        Q.    Okay.  Janie?

 2        A.    Janie.  Yeah.  Janie, the OS&B lady.

 3        Q.    Was Janie in there?

 4        A.    Yes.

 5        Q.    Okay.  Was there anyone else besides Gilbert,

 6   Rick Weeks, George Prado, Jr., and the two ladies that

 7   you've mentioned, Mari and Janie?

 8        A.    No, sir.

 9        Q.    All right.

10        A.    That I can recall.

11        Q.    Okay.  Now, after Gilbert told you you could

12   not take a different tractor, you say that Rick Weeks

13   told you you could?

14        A.    Yes, sir.

15        Q.    Was Rick Weeks standing at Gilbert's desk

16   when he said that?

17        A.    No, sir.  He was still sitting at his desk.

18        Q.    He was still sitting.  But didn't he get up

19   and come over and talk to you, or did he not ever get up

20   out of his desk?

21        A.    No, sir.  He never got up.

22        Q.    Okay.  He sat in his desk and made the

23   comment about we all are required to check the weather?

24        A.    That's correct.

25        Q.    All right.  And so did you then turn and
```

1  leave Gilbert's desk and go over and talk to Rick Weeks?

2       A.    Yes, sir.

3       Q.    All right.  And at that point Rick Weeks

4  said, take a different tractor?

5       A.    Yes, sir.

6       Q.    All right.  George Prado, Jr. is still

7  sitting off behind Rick Weeks at that point?

8       A.    Yes, sir.

9       Q.    All right.  And so you did take a different

10 tractor?

11      A.    Yes, sir.

12      Q.    All right.  Which tractor did you take?

13      A.    I don't recall.

14      Q.    All right.

15      A.    I didn't think about it because I didn't

16 think it was going to be an issue.

17      Q.    Okay.  And you completed your work that day?

18      A.    Yes, sir.

19      Q.    And it didn't rain?

20      A.    No, sir.

21      Q.    And then you came back the next day --

22      A.    Yes, sir.

23      Q.    -- and worked?

24      A.    Actually, I walked in and Martha was waiting

25 for me.

1      Q.    The -- the day you returned?

2      A.    Tuesday.  She was out Monday.  So I think she

3  came back Tuesday.

4      Q.    So Martha Coleman wasn't even at the service

5  center on the Monday that -- that this discussion

6  happened about a different tractor?

7      A.    That's correct.

8      Q.    All right.  So Tuesday morning you show up

9  for work at your regular time, and Martha Coleman called

10  you into her office.  Was that before or after the

11  pre-shift?

12      A.    After.

13      Q.    Okay.  So you attended the pre-shift meeting.

14  And then after the pre-shift meeting before you left she

15  called you into her office; Martha Coleman did?

16      A.    Yes, sir.

17      Q.    True?  Was anyone else in the office with

18  you?

19      A.    Yes.

20      Q.    Who else?

21      A.    Rick Weeks and Gilbert Trevino.

22      Q.    All right.  So the four of you were in Martha

23  Coleman's office?

24      A.    Yes, sir.

25      Q.    All right.  And what happened in that

1    meeting?

2         A.    She started telling me that I shouldn't have

3    taken the tractor that I did, that I caused a big ruckus

4    in the office, and that I should have taken the tractor

5    that I was assigned to and that I was going to get

6    written up.  And I said I was -- I didn't agree with

7    what she said.  But as I opened the door to leave, she

8    was taunting me.  Go ahead and call the -- go call the

9    managers or go call the supervisor -- I forgot the big

10   -- not the guys upstairs, but the upper management.

11   Because she already knew that that's who I would call.

12        Q.    Did anyone else say anything in that meeting

13   besides Martha Coleman?

14        A.    No.  Pretty much she was the one that was

15   saying everything.

16        Q.    Rick Weeks didn't speak?

17        A.    Pretty much he just agreed with what she was

18   saying.

19        Q.    And Gilbert Trevino?

20        A.    Yes.

21        Q.    Yes?

22        A.    Yes.

23        Q.    But when you say just pretty much agreed,

24   what -- what do you mean by that?

25        A.    Pretty much like she was just stating what --

1  I guess they wrote a report and she had read it and she

2  was pretty much just reading it back to me.  And they

3  were just stating yes.

4      Q.    But they did say yes or somehow verbally

5  agree with what she was saying?

6      A.    That's correct.

7      Q.    All right.  And what did you say in the

8  meeting?

9      A.    I said that it wasn't fair that I was being

10  made to -- to do something that it's against DOT and

11  FedEx regulations.  I feel like I'm being -- I'm being

12  targeted and I'm being -- like I'm being bullied or I'm

13  being -- I forgot the name of the word.  But, anyway,

14  she taunted me and told me, go call your supervisor, go

15  call your manager.  Because she -- like I said, she

16  already knew that I had been talking to them.  So -- but

17  she said she was going to write me up.  So I got in my

18  tractor.

19      Q.    And by the way, the tractor that you got into

20  on Tuesday was L-3968, wasn't it?

21      A.    They had fixed it that day, that morning.

22      Q.    All right.  It was already fixed?

23      A.    Yes.  It was on the -- on the DVIR where the

24  mechanic, he signs where he has to fix it and the date

25  he fixed it.

1      Q.    Right.  So when you took it out on Tuesday

2   the blower was working --

3      A.    Correct.

4      Q.    -- on all speeds?

5      A.    Yeah.  And I'm -- to be honest with you, I

6   was so distraught.

7               MR. HOLMES:  Just answer the question.

8               THE WITNESS:  Yes, sir.

9      Q.    (By Mr. Shivers)  All right.  So when you got

10  there you took that same tractor, but it had been

11  repaired.  And that was Tuesday.  And you ran your whole

12  run that day --

13     A.    Yes, sir.

14     Q.    -- in that tractor?

15     A.    Yes, sir.

16     Q.    Okay.

17     A.    But I did call Joe Vargas, which is our

18  safety director up in Dallas.  I did tell him what was

19  going on, that I was going to get written up because I

20  took a trac -- they wanted me to take a tractor that the

21  blower was out.  And Joe Vargas said to me that in no

22  way or manner are you supposed to take that tractor out

23  onto the road.  I will call Ms. Coleman and I will let

24  her know that she's not to write you up because you did

25  the right thing.  So after I hung up with Joe Vargas, I

1    -- I called Ms. Irene and I told her what was going on.

2    And I told her that -- and she said, you know, we can

3    talk in person because I'm going to be there at the

4    terminal on Wednesday.  So we can talk.  You can come in

5    the office and we'll talk.

6         Q.    All right.  So you called Joe Vargas and then

7    you called Irene French?

8         A.    (Nodded.)

9         Q.    And she said she was going to be there the

10   next day, Wednesday?

11        A.    Correct.

12        Q.    Because this was all happening on Tuesday

13   that you called Joe and --

14        A.    Correct, yes.

15        Q.    All right.  And then so you show back up at

16   work on Wednesday?

17        A.    Correct.

18        Q.    And did you drive that day?

19        A.    No.

20        Q.    You did not drive on Wednesday?

21        A.    I was suspended.

22        Q.    Okay.

23        A.    I went in to talk to Ms. Irene.

24             MR. HOLMES:  Just answer the questions.

25             THE WITNESS:  Okay.  Yes.

1      Q.    (By Mr. Shivers)  Are you sure it was

2  Wednesday and not Thursday you were suspended?

3      A.    The minute that I walked out of talking to

4  Ms. -- to Ms. -- to Ms. French, out of talking to her,

5  Ms. Coleman called me into her office and told me I was

6  suspended.

7      Q.    Okay.  So whatever day that was, that's when

8  you were suspended.  Okay.  So on Tuesday you had the

9  meeting with Martha Coleman, with Gilbert and Rick; and

10  you were told you were going to be written up.  And so

11  you called Joe Vargas and you called Irene French.  And

12  you went ahead and worked that day, drove your route.

13  And then on Wednesday you came back.  And when you got

14  to work on Wednesday, what happened?

15      A.    I went in and talked to Irene for 15, 20

16  minutes.  And then as soon as I stepped out of the

17  office, I was called into Ms. Coleman's office and she

18  told me I was suspended.

19      Q.    All right.  So where did you talk with Irene

20  French?  What -- what location in the office were you

21  then?

22      A.    It's the office right next to Martha's.

23      Q.    Okay.  The office next door where the --

24      A.    Where they show the videos and -- and -- and

25  Rick sometimes uses that as his -- as his office.

APPENDIX 025

1      Q.    Okay.  So you met with Irene French for I

2  guess, what did you say, 15 minutes?

3      A.    I want to say 15 to 20 minutes.

4      Q.    All right.  And what happened in that

5  meeting?

6      A.    I just told her everything that was going on.

7  I just told her that I felt that I was being targeted to

8  get fired.  I -- I told her that I feel -- I'm already

9  anxiety and depression.  And I told her everything that

10  she'd been doing to me and that -- and Irene said, okay,

11  we'll take care of it.  And I thought I was going to

12  get helped.  And the next thing I know I'm going into

13  Ms. -- into Martha's office.  And she tells me, give me

14  your keys.  Give me your badge.  And you're gone.

15  You're suspended.

16      Q.    Suspended.  Okay.

17      A.    And then she called me four days later and --

18  I finally got rid of you.  You're gone.  You're fired.

19      Q.    Okay.  Let's -- let's back up, then.

20  Mr. Briones, we've handed you a document that we've

21  marked as Exhibit 17 to your deposition.  Do you

22  recognize that document?  And by the way, let me -- I

23  think there is a second page to that document.  Let me

24  go ahead and give that to you.  It's a two-page

25  document.

1    in what they did.  You're right; they're wrong.  We got

2    -- your check is coming in the mail.  And I said, thank

3    you.

4        Q.    All right.  This is all before the appeal?

5        A.    That's correct.  Yes.  Because I was already

6    terminated when they told me that I was terminated.

7        Q.    All right.  So you got unemployment

8    compensation benefits?

9        A.    That's correct.

10       Q.    All right.  When did you start drawing those?

11       A.    Like two months later.

12       Q.    And for how long did you continue to draw

13   those benefits?

14       A.    For the six months that they give you.

15       Q.    During that six-month period were you

16   required as a condition of continuing to get the

17   benefits to go through some sort of job search process?

18       A.    Yes, sir.  I was required to search for three

19   jobs a week.

20       Q.    When you say search for three jobs a week,

21   what does that mean?

22       A.    Texas -- Texas Employment Commission has a

23   website where you can check and see the job openings it

24   has.  So you search on there.

25       Q.    So you would go online and look at the job

1    openings?

2         A.    Correct.  Other than the -- yes, I would.

3         Q.    Okay.  And then what were you required to do

4    about three jobs?  Apply to three jobs or -- or what was

5    the three?

6         A.    Yes, sir.  You would apply to the jobs.

7         Q.    Okay.  So you would search their database,

8    and you were required to apply to three jobs per week?

9         A.    That's correct.

10        Q.    All right.  And you had to do that in order

11   to keep getting your benefits?

12        A.    That's correct.

13        Q.    All right.  And I presume you did that for

14   the six months, for the entire six months?

15        A.    Yes, I did.

16        Q.    All right.  And as a result of those

17   applications, three per week for six months, did you get

18   any interviews, any callbacks, any interest?

19        A.    No, sir.

20        Q.    Is there a record of the jobs that you

21   applied for?

22        A.    Yes, sir.

23        Q.    Where is that record?

24        A.    I gave those documents to Mr. Holmes.

25        Q.    All right.  So that six-month period you say

```
1    started two months after you were terminated?

2         A.    Yes, sir.

3         Q.    Were they retroactive back to that?

4         A.    Yes, sir.

5         Q.    To the termination?

6         A.    I owed -- many, many years ago I had filed

7    for unemployment and they paid me I think a month and a

8    half or something like that.

9         Q.    Overpayment?

10        A.    Right.  And then since they wanted their

11   money back, they took it out from right there.

12        Q.    Okay.  But then for a period of six months

13   you went through this process where you're applying and

14   -- and you're drawing the benefits?

15        A.    Yes.

16        Q.    So presumably that takes you up through the

17   rest of 2016.  Because you were terminated on June the

18   1st.

19        A.    Up to January.

20        Q.    Up to January.  Okay.  What happened in --

21   January is when the benefits ran out?

22        A.    Yes, sir.

23        Q.    January of 2017?

24        A.    Yes, sir.

25        Q.    Early or late January?
```

1       A.    Early.

2       Q.    All right.  And --

3       A.    I'm sorry.  Can I take that back?  It was

4   actually December.  Because it was June, July, August,

5   September, October, November, December.  October --

6   yeah.  It was around December.  Because I remember I

7   couldn't even get presents for my kids.

8       Q.    So they ran out in December of 2016?

9       A.    Yes, sir.

10      Q.    All right.  And then what did you do in terms

11  of looking for jobs after that?

12      A.    Kept looking.

13      Q.    And when did you find a job the first time?

14      A.    The first time a job -- I found a job was in

15  July of 2017.

16      Q.    Okay.  Was it early, mid, late July?

17      A.    Early.

18      Q.    Okay.  And what was that job?

19      A.    Southwest Motor Transport, SMT.

20      Q.    Southwest --

21      A.    Motor Transport.

22      Q.    -- Motor Transport?  And where are they

23  located, or where were you working for them?

24      A.    In Harlingen.

25      Q.    In Harlingen.  Okay.  And what was your job

1  with Southwest Motor Transport?

2       A.    Shuttle driver.

3       Q.    And what is a shuttle driver?

4       A.    They take trailers with -- with merchandise

5  to centers, San Antonio, Dallas, Houston, Laredo.

6       Q.    To centers?

7       A.    To centers like, yeah, distribution centers,

8  like the SMT center.

9       Q.    Okay.  So you're taking it like to a terminal

10 or --

11      A.    Correct.

12      Q.    Okay.  Is that like or different from a line

13 haul driver at FedEx Freight?

14      A.    It pretty much falls under the same category.

15      Q.    Okay.  So it would be similar to what a -- a

16 line haul driver does at FedEx Freight?

17      A.    Yes, sir, uh-huh.

18      Q.    All right.  So you started there in early

19 July of 2017.  And how long did you work for Southwest

20 Motor Transport?

21      A.    For about a month.

22      Q.    Why did you leave Southwest Motor Transport?

23      A.    I was working all night.  And there was times

24 that I would stay out one day out on the road, and I

25 didn't like leaving my elderly mom alone.  So I found

1    another job.  And they had called me from Ben E. Keith.

2         Q.    You found a job with who now?

3         A.    Ben E. Keith, Ben E. Keith.

4         Q.    Okay.

5         A.    Yeah.

6         Q.    All right.  Is Ben E. Keith a trucking

7    company, or what is Ben E. Keith?

8         A.    Yes, sir.  It's a trucking company.  They --

9    they ship produce.  I mean, not produce, but they -- you

10   know, the restaurant, the -- the food --

11        Q.    Food service?

12        A.    Exactly.

13        Q.    Okay.  So is it like a food service

14   warehouse?  Is that what Ben E. Keith is?

15        A.    Yes, sir.

16        Q.    Kind of like Sysco or something like that?

17        A.    There you go.  Yes, sir.

18        Q.    Okay.

19        A.    Uh-huh.

20        Q.    And how did you find out about the Ben E.

21   Keith job?

22        A.    I always look on Indeed, the website for job

23   -- for jobs.  So that one came out and I applied for it.

24        Q.    You were already working at Southwest when

25   you saw that job?

1       A.    That's correct.

2       Q.    And you applied online --

3       A.    Yes.

4       Q.    -- with them and you got hired?

5       A.    Yes.

6       Q.    Okay.  When you were working for Southwest

7   Motor Transport, how were you compensated there?

8       A.    We were getting paid by the mile.

9       Q.    Okay.  And when you took the job with Ben E.

10  Keith, when did you start?

11      A.    I started there August 29th -- 28th.

12      Q.    August 28th?

13      A.    That's correct.

14      Q.    Of 2017?

15      A.    That's correct.

16      Q.    And your job at Ben E. Keith is -- is -- was

17  what?  You're still there?

18      A.    Yes.

19      Q.    Okay.  That's where you're working now?

20      A.    Yes, sir.

21      Q.    All right.  So what -- what was your position

22  when you started in August of 2017?

23      A.    I'm a shuttle driver, shuttle driver.

24      Q.    A shuttle driver?

25      A.    Yes, sir.

Date: 5-3-16    Location:

Unit #: L-3968    Driver #: 2449651

Trailer 1 #: 8892    Trailer 1 #:

Dolly#: _____    Dolly#: _____

**\*\*\* P/D TRIPS ONLY \*\*\***

Pre-Trip Inspection Finish Time: 10:45

Trailer 2 #: _____    Trailer 2 #: _____

Dolly#: _____    Dolly#: _____

ODOMETER:

Starting: 846    First Stop: 855

Last Stop: 937    Ending: 999

Trailer 3 #: _____    Trailer 3 #: _____

LUNCH:

Arrive Time: 14:45    Depart Time: 15:15

Post-Trip Inspection Finish Time: 17:30

OUT OF STATE P/D MILES

State _____ Miles _____ State _____ Miles _____

- ❑ Linehaul Run
- ❑ P/D Run    OPR. Area _____

## SAFETY DEFECTS CHECKLIST

- ❑ Tires
- ❑ Wheels/Rims
- ❑ Emergency Equipment
- ❑ Brakes-Service/Parking/Trailer
- ❑ Horn
- ❑ Lighting Devices/Reflectors
- ❑ Rear Vision Mirrors
- ❑ Coupling Devices
- ❑ Steering Mechanism
- ❑ Windshield Wipers

## OTHER DEFECTS

- ❑ Collision Avoidance Devices
- ❑ Placards Displayed (if required)
- ❑ Emergency Response Guidebook
- ❑ Accident Packet
- ❑ Trailer Door
- ❑ Permit Book
- ❑ Fuel, Oil, and Water
- ❑ Visible Equipment Damage
- ❑ Other Defects (See Comments)
- ❑ **NO DEFECTS FOUND**

Defects or Comments: AC Blower is not working No Air is coming out

I have completed Pre-Trip and Post-Trip Inspections:

1st Driver's Signature:
(Leave in book for next driver)    Date: 5-20-16

Defects have been corrected or no corrections necessary
Company Agent's Signature: _Rey Greer_

I have reviewed this report and will carry it on my trip:
Next Driver's Signature _____    Date: 5-24-16

   Date: 524-16

NEXT DRIVER should remove this copy from book, along with yellow copy for current Tour of Duty/Day's Work.
all Data form in to Service Center
SERVICE CENTER should file for 90 days in unit specific file.

APPENDIX 034

## Martha Coleman

| | |
|---|---|
| From: | Rick Weeks |
| Sent: | Tuesday, May 24, 2016 12:06 PM |
| To: | Martha Coleman |
| Subject: | RE: Rick Briones 05/24/2016 Disrupting / Loud |

Categories:                Blue Category

**From:** Rick Weeks
**Sent:** Tuesday, May 24, 2016 11:44 AM
**To:** Rick Weeks
**Subject:** Rick Briones 05/24/2016 Disrupting / Loud

Yesterday May 23,2016:

Subject: Disrupting and loud

Yesterday as I walked into the office I noticed Mr. Briones standing in front of Gilbert Trevino Desk asking him about the tractor L3968 assigned to him daily, stating the blower on the tractor don't work and that Joe the shop supervisor has the part on order and he needed a different Tractor if it rains he wont be able to see because it will fog up the windshield.

Gilbert Trevino explained to Mr Briones that its not suppose to be raining today and when Gilbert Trevino told Mr Briones this he became very Loud stating Oh now your doing the Forecast ( weather ) in the office very Loud where other's in the office over hearing Rick Briones getting upset and very Loud with Gilbert Trevino.

I Rick Weeks Supervisor Heard the statement made By Rick Briones to Gilbert Trevino so I step into the Conversation & Explain In Detail to Rick Briones That Yes this is part of our Job Daily to report on the weather each and everyday, I Tried to Diffuse the Conversation and to help lower Rick Briones tone of voice.

Thanks
Rick Weeks
Ops Supervisor
HRL302

1

**FEDEX 000492**

APPENDIX 035

## Martha Coleman

| | |
|---|---|
| **From:** | Gilbert Trevino |
| **Sent:** | Tuesday, May 24, 2016 12:18 PM |
| **To:** | Martha Coleman |
| **Subject:** | Rick Briones |
| | |
| **Categories:** | Blue Category |

On 05/23/2016 Rick Briones approached me at approximately 10:15 am and asked me to change his tractor L3968 because the blower for the defrost on L3968 was not working. I asked Rick Briones if he had taken tractor L3968 by the shop to confirm and inspect if its a safety issue and Rick Briones said, "Yes, I already spoke to Joe Ochoa (Shop Supervisor) and he said it was out of service.

I called Joe Ochoa on his cell phone with Rick Briones present to confirm. Joe Ochoa stated tractor L3968 blower was working but shop had ordered a new switch for the tractor. He also stated L3968 was safe to drive. I asked Rick Briones why he lied to me stating he spoke to Joe Ochoa if that was not true, Rick Briones said "I meant I spoke to Rick Weeks and Rick weeks said to get with you for a new tractor." I informed Rick Briones since it was not a safety issue he needed to take his assigned tractor L3968.

At that time Rick Briones started raising his voice at me in front of the whole office saying " Well what about the drivers, now your putting our safety at risk" I replied "Rick I just confirmed with Joe Ochoa in front of you and he stated tractor L3968 is working and safe to drive. Rick Briones continued to argue back and fourth with me about taking another tractor while continuing to raise his voice. I tried to calm Rick Briones down but the more I tried to calm him the more upset he would get.

Rick Briones stated he was concerned because the blower was NOT working, that if it rained, the windows would fog up & this would become a safety issue. I informed Rick Briones that there is not rain in the forecast. Rick responded sarcastically & loud by saying "Oh, so now you're the forecaster?" As leadership, I kept my composure and remained professional. Rick disrupted the office, speaking loudly while an office associate was on the phone with a customer.

I was very humiliated by his behavior towards me especially in front of other office employees, he was very disruptive, loud, and rude towards me that just kept escalating to the point that another supervisor (Rick Weeks) had to intervene just to defuse the situation.

Gilbert Trevino

1

FedEx

## EMPLOYEE STATEMENT OF INCIDENT

Employee Name _Juana M DelaRosa_      Emp ID _19746 00_

Position _OSTD ASSOC._      Location _HRL_

Home Phone #: _956-561-4114_      Other Contact Phone # (optional) _956-832-3782_

Date(s) of Incident(s) _5-23-16_

Employee Statement of Incident:

On 5-23-16 while I was on the phone with a customer I overheard Mr. Ricardo Brimes talking to Gilbert Trevino (ops). The conversation caught my attention because Mr. Brimes was speaking pretty loud and I actually thought he was arguing with Mr. Trevino (ops). I heard him speak very loud and rudely to him regarding some sort of issue with his tractor. I heard Mr. Gilbert Trevino tell Mr. Brimes to get with Joe Ochoa the mechanics regarding issues with tractor.

Employee Signature _Juana M DelaRosa_      Date: _5-24-16_

YOUR District Human Resources ADVISOR IS:
Irene French
Office Number: 800-826-3875

**FEDEX 000494**

APPENDIX 037

FedEx

# EMPLOYEE STATEMENT OF INCIDENT

Employee Name  Maribel Ordoñez          Emp ID  1514227
Position  Customer  Support             Location       HRL
Home Phone #: _____  Other Contact Phone # (optional) _____
Date(s) of Incident(s)  Monday  5/23/16

Employee Statement of Incident:
I saw & heard Mr. Rick Briones
being very rude & loud with Gilbert Trevino
regarding some equipment.

Employee Signature  Maribel Ordiz          Date: 5-24-16

YOUR District Human Resources ADVISOR IS:
Irene French
Office Number: 800-826-3875

**FEDEX 000495**

APPENDIX 038

May. 27. 2016 12:47PM                                           No. 3969   P. 2



**FedEx** Freight                                    Corrective Action Recap

**EMPLOYEE INFORMATION:**

Employee ID:      2449651

Name:             Ricardo Briones

Location:         HRL

Position:         City Driver

Date of Hire:     03/07/2011

Date of Incident: 05/2316

Date Prepared:    05/26/16

RECEIVED
JUN 0 2 2016
By_____

**SUMMARY:**

On 5/23/16 around 10:15 AM, City Driver Rick Briones was witnessed being argumentative, loud, disruptive and insubordinate towards Operations Supervisor Gilbert Trevino.

After Mr. Briones was assigned tractor L3968, he approaced Mr. Trevino in the office and stated that the defrost blower was not working on L3968. When Mr. Trevino asked if he had confirmed the issue with Joe Ochoa (FM Supervisor) Briones said; "Yes, I already spoke to Joe Ochoa and he said it was out of service." Mr. Trevino called Joe Ochoa and found out that the unit was not out of service and was safe to drive. Immediately after Mr. Trevino asked Mr. Briones why he had been dishonest, Mr. Briones raised his voice towards Mr. Trevino, and according to Trevino: "Rick Briones continued to argue back and forth with me about taking another tractor while continuing to raise his voice. I tried to calm Rick Briones down but the more I tried to calm him the more upset he would get."

This incident distracted two Service Center Support employees, Juana Dela Rosa and Maribel Ordonez, and it was also witnessed by OM Rick Weeks.

Ms. Dela Rosa stated: "…. I was on the phone with a customer I overheard Mr. Ricardo Briones talking to Gilbert Trevino(ops). The conversation caught my attention because Mr. Briones was speaking pretty loud and I actually thought he was arguing with Mr. Trevino (ops). I heard him speak very loud and rudely to him regarding some sort of issue with his tractor."

Ms. Ordonez stated: "I saw & heard Mr. Rick Briones being very rude & loud with Gilbert Trevino regarding some equipment."

Mr. Weeks stated: "Yesterday as I walked into the office I noticed Mr. Briones standing in front of Gilbert Trevino desk asking him about the tractor L3968 assigned to him daily….. Gilbert Trevino explained to Mr. Briones that its not suppose to be raining today and when Gilbert Trevino told Mr. Briones this he becaem very loud stating Oh now your doing the Forecast (weather) in the office very loud…."

In Mr. Briones' statement he wrote: "….I got desperate and my voice might have gotten a litter higher but I never said anything disrespectfully to anybody."

During the investigation it was discovered that Mr. Briones had also became upset and loud with FM Supervisor Joe Ochoa about a month prior to the 5/23/16 incident. When Mr Briones was asked about this incident, he admitted that he became frustrated that day and stated that he apologized to Mr. Ochoa.

Name: Ricardo Briones - 2449651                        Page 1 of 2

05/27/2016   6:01PM (GMT+00:00)

FEDEX 000499

May. 27. 2016 12:48PM                                    No. 3969   P. 3



Corrective Action Recap

INSERT FXF POLICY:
Conduct of Employees
STANDARDS OF CONDUCT
The following items represent unacceptable performance and behavior in the work environment.While
not intended to be all-inclusive, this document lists areas that are basic to the welfare of employees,
customers and the company.
Insubordination
Employees must follow work instructions. Differing ideas or suggestions are welcome, but should be
discussed in an appropriate manner. Examples of insubordination include:
· Improper refusal to perform assigned work.
· Failure to follow work instructions or meet employee job expectations.


PRIOR CORRECTIVE ACTION:
☒ Yes   ☐ No   *If yes, please list below:*

5/13/16 - Coaching FFI;
4/26/16 Coaching-FFI;
02/03/16 Written FFI;
02/02/16 Written FFI;
01/29/16 Coaching FFI;
01/11/16 Coaching FFI;
01/06/16 Coaching FFI;
11/13/15 Crital Written Misconduct - Horesplay - Disruptive behavior during a pre-shift meeting.
08/18/15 Critical Written - Misconduct- Offensive, insulting or abusive language


CONCLUSION / RECOMMENDATION:
Termination is recommended for Misconduct / Insubordination and disruptive behavior in the
workplace.


HAVE THE FOLLOWING BEEN REVIEWED?

| | | |
|---|---|---|
| Statements and Supporting Documentation: | ☒ Yes | ☐ N/A |
| Performance Evaluation: | ☐ Yes | ☒ N/A |
| Handbook Receipt: | ☒ Yes | ☐ N/A |
| Education Materials: | ☐ Yes | ☒ N/A |

Completed by:                                    Employee ID:


Name: Ricardo Briones - 2449651                           Page 2 of 2
                                    05/27/2016   6:01PM (GMT+00:00)

FEDEX 000500

**Atlantic Steel Company *and* Kenneth Chastain.** Case 10–CA–13634

September 28, 1979

### DECISION AND ORDER

BY MEMBERS PENELLO, MURPHY, AND TRUESDALE

On December 15, 1978, Administrative Law Judge Walter H. Maloney, Jr., issued the attached Decision in this proceeding. Thereafter, Respondent filed exceptions and a supporting brief, and the Charging Party filed an answering brief.

Pursuant to the provisions of Section 3(b) of the National Labor Relations Act, as amended, the National Labor Relations Board has delegated its authority in this proceeding to a three-member panel.

The Board has considered the record and the attached Decision in light of the exceptions and briefs and has decided to affirm the rulings of the Administrative Law Judge, and to adopt his findings and conclusions only to the extent consistent herewith.

Although an arbitrator had previously upheld the discharge of Kenneth Chastain for calling his supervisor a "lying s.o.b.," the Administrative Law Judge found that the arbitrator confined his decision to legal issues arising under the contract and failed to consider whether the conduct amounted to an unfair labor practice. The Administrative Law Judge found that Respondent violated Section 8(a)(1) and (3) of the Act by discharging Chastain because, at the time Chastain made the remark, he was discussing a grievance and therefore was engaged in protected concerted activity. Respondent maintains that Chastain was discharged for insubordination, and that the Board, under its *Spielberg* doctrine,[1] should defer to the arbitrator's award which upheld the lawfulness of the discharge. We agree with Respondent.

The facts, as found by the arbitrator, are relatively simple.[2]

Around 2 p.m. on November 3, 1977, employee Kenneth Chastain, during his regular work shift, approached his foreman in the production area, and asked him a question about assignment of overtime by seniority. Chastain was concerned that a probationary employee had worked overtime. Shortly thereafter, the foreman returned with an answer, also stating that he had asked all of the crew to take the overtime. Based on the testimony of four witnesses— two employees, the foreman, and Chastain—the arbitrator found that, as the foreman was walking away from the area, Chastain turned to another employee and either called the foreman a "lying son of a bitch" or stated that the foreman had told a "m— f— lie" (or was a "m— f— liar") as to whether he had asked the entire crew to work overtime. The foreman heard his statement and told Chastain to go to the office. Chastain was suspended pending discharge and thereafter terminated.

At the arbitration hearing, Chastain claimed that the foreman had been harassing him for circulating a petition concerning benefits, and that the discharge was part of that harassment. Other claimed harassment was the foreman's complaint that he was spending too long in the bathroom, and that the foreman had poked him in the chest with a finger, insisted that he wear his hardhat, and objected to his rejection of certain of Respondent's products as defective.[3] The foreman denied all of these claims except the complaint about his going to the bathroom too frequently. In any event, the arbitrator found that Chastain had not been disciplined for any of these incidents, and that Respondent did not rely on them as grounds for the discharge.

The arbitrator also noted, as conceded by both Respondent and the Union, that Chastain was discharged on the basis of his entire record, and not solely because of the incident with the foreman. In the preceding 3 years, Chastain had been suspended twice and given two warning letters. The first suspension, for poor work performance which curtailed production, was grieved but not taken to arbitration. The second suspension—which occurred only 10 months before the final incident—was for cursing in the presence of female clerks in violation of a supervisor's directive not to use such language. This suspension was grieved and taken to arbitration, whereupon the same arbitrator who issued the instant decision upheld the suspension but reduced it from 2 days to 1 day. The arbitrator also observed in the present proceeding that Chastain had a poor attendance record—32 instances of tardiness, 1 of which concerned his leaving early with no apparent excuse, and 7 unexcused absences.

Based on all of the above, the arbitrator concluded that Respondent had good cause for the discharge. He found that Chastain had properly questioned the foreman about overtime, and that the foreman had acted promptly to answer the question. The arbitrator, concluding that Chastain's obscene reaction to the supervisor was unwarranted insubordination, noted that:

---

[1] *Spielberg Manufacturing Company,* 112 NLRB 1080 (1955).

[2] We defer to the arbitrator's factual findings for the reasons stated in *The Kansas City Star Company,* 236 NLRB 866 (1978), to wit: (1) The findings are consistent with the record evidence; (2) there are no irregularities in the proceedings; and (3) there are no facial errors in the factual findings.

We note, as discussed *infra*, that there is a factual parrallel between the contractual and unfair labor practice questions which makes the arbitrator's factual findings controlling for purposes of resolving the unfair labor practice. Indeed, the arbitrator's decision implicity resolved the unfair labor practice, and we defer to this resolution.

[3] Chastain filed five grievances claiming harassment.

If Mitchell [the foreman] was in error in stating the entire crew had been offered the overtime, a grievance was the proper way to correct the mistake. But the use of insulting, obloquous [sic] language to other employees about their supervisor in the hearing of the supervisor cannot be regarded as "mere disrespect." On the contrary it shows a willful disregard for constituted industrial authority, a challenge to the dignity and character of the foreman, [and] a derrogation [sic] of the authority necessary to direct the working forces. Under any definition, this, in the setting it was found, constitutes insubordination.

Furthermore, the arbitrator found that any alleged harassment by Respondent played no role in the decision to discharge, since these alleged incidents were not "a causitive [sic] factor for Grievant's utterance concerning Mitchell. Grievant's language was a reaction to information supplied by Mitchell at Grievant's request. In this there was obviously disagreement, but not provocation." He also found that, while a supervisor once cursed an employee without being disciplined, that single event did not constitute a practice which would justify Chastain's language "in the circumstances where it was uttered." Finally, the arbitrator concluded that the discharge was warranted because Respondent did not discharge Chastain because of one insubordinate act. Rather, the discharge was part of a pattern of progressive discipline by Respondent, which included a prior suspension for a similar act.

Applying the analytical framework of the majority in *The Kansas City Star Company*, *supra*, the Administrative Law Judge refused to defer to the arbitrator's decision. He stated two reasons for refusing to defer: (1) The arbitrator had not decided the underlying unfair labor practice, and (2), alternatively, the arbitrator's conclusion, based on the facts found by the arbitrator, was not consistent with Board law.

We do not agree with the Administrative Law Judge. Rather, applying *Kansas City Star* and other *Spielberg* precedent to this case, we find that the Board should defer to the arbitrator's decision. In *Raytheon Company*,[4] cited in *Kansas City Star* and here by the Administrative Law Judge, the Board added the requirement to *Spielberg* that, in order for the Board to defer, the arbitrator must have considered the unfair labor practice in his decision. Since that time, there has been little discussion by the Board as to what this requirement means. Must the arbitrator actually discuss the unfair labor practice, or is it sufficient that he or she considered all of the evidence relevant to the unfair labor practice in determining whether the discharge was lawful under the

contract? A review of the decisions shows that, while it may be preferable for the arbitrator to pass on the unfair labor practice directly, the Board generally has not required that he or she do so. Rather, it is necessary only that the arbitrator has considered all of the evidence relevant to the unfair labor practice in reaching his or her decision. For example, in *Raytheon*, *supra*, the Board refused to defer to an arbitrator's decision because "the arbitrator did not, and was advised that he could not, even consider evidence that protected concerted and union activities were possible causes for the discharges."[5] Accordingly, the record which was developed before an arbitrator was inadequate for resolving the unfair labor practice.

Similarly, in *Clara Barton Terrace Convalescent Center, a Division of National Health Enterprises-Delfern, Inc.*,[6] also relied on here by the Administrative Law Judge, the Board, with Members Penello and Walther dissenting, refused to defer because the arbitrator had not considered the unfair labor practice issue either explicitly *or* implicitly. Even assuming an "implicit" resolution of the alleged unfair labor practice, that "implicit decision necessarily conflicted with the Act's protection."[7] Thus, while refusing to defer in that instance, the Board recognized that the *Spielberg* doctrine could be satisfied where the arbitrator's decision *implicitly* resolved the unfair labor practice.

More recently, in *Kansas City Star*, *supra*, the Board, with Chairman Fanning and Member Jenkins dissenting, deferred to the findings of the arbitrator in resolving the legality of the discharge of several strikers and the subsequent rescission of the collective-bargaining agreement. On the first issue, the arbitrator not only made all of the factual findings necessary to deciding the legality of the discharges, but he also decided that the discharges did not violate the Act. On the second issue, however, he made the requisite factual findings, but he did not determine the legality of rescission under the Act. The Board nevertheless deferred to his findings with respect to *both* issues. This was because the findings were both complete and comprehensive and factually parallel to the unfair labor practice question.

In the instant case, the arbitrator's findings are also complete and comprehensive[8] and factually parallel to the alleged unfair labor practice. Thus, with re-

---

[4] 140 NLRB 833 (1963), enforcement denied 326 F.2d 471 (1st Cir. 1964).

[5] 140 NLRB at 886.

[6] 225 NLRB 1028 (1976).

[7] 225 NLRB at 1029.

[8] This factor distinguishes this case from *Electronic Reproduction Service Corporation; Madison Square Offset Company, Inc., and Xerographic Reproduction Center, Inc.*, 213 NLRB 758 (1974), where the Board deferred to the arbitrator's decision, even though he had not considered evidence that the employee had been discharged for union activity. That Decision, however, was effectively overruled in *Max Factor & Co.*, 239 NLRB 804 (1978), where Member Murphy expressed her disagreement with it. Chairman Fanning and Member Jenkins dissented in the original Decision.

spect to the confrontation between the supervisor and Chastain, the arbitrator considered the testimony of both participants, as well as three employees who observed the events.[9] On the basis of all of their testimony, he made a factual determination of what occurred.[10] As part of his findings, he concluded that Chastain could formally grieve his complaint about overtime, but that his questions in that regard did not justify his statements about the supervisor.

In concluding that Chastain's statements were unjustified, the arbitrator also considered Chastain's allegation that he was discharged as part of a pattern of harassment for having circulated a petition concerning benefits. He rejected this claim and found that Chastain was discharged on the basis of his entire disciplinary record, including the uttering of the obscenities about the supervisor, and not as part of any campaign of harassment. We are satisfied that the arbitrator thoroughly considered all of the evidence and made factual findings that are clearly supported by the evidence. Accordingly, we defer to his factual findings.[11]

We also disagree with the Administrative Law Judge's conclusion that deferral was not warranted because the arbitrator's conclusion was repugnant to the Act. The Administrative Law Judge stated:

Without in any way disturbing the arbitrator's credibility findings or his factual analysis, it is clear from facts he found that this Respondent had invaded Chastain's rights under Section 7 of the Act.

According to the Administrative Law Judge, Chastain's questions about overtime constituted a grievance and protected concerted activity. Therefore, when Chastain used the term "lying son of a bitch," or "m— f— lie" (or "liar"), the Administrative Law Judge reasoned that this conduct, as a part of the *res gestae* of the grievance, was also protected. As support for this conclusion, he relied on two lines of precedent. The first group of cases[12] dealt with formal

grievances or negotiating sessions which were conducted away from the production area. There, in the heat of discussion, an employee uttered an obscenity or used extremely strong language. In that context, the employee's conduct was found to be protected as part of the *res gestae*. Under the other line of precedent, represented by *Merlyn Bunney and Clarence Bunney, partners, d/b/a Bunney Bros. Construction Company*,[13] and *Interboro Contractors, Inc.*,[14] the Board concluded that an individual employee's complaint under the contract about working conditions constituted protected concerted activity. The employee in question, however, made no obscene or insulting statement.

The Administrative Law Judge cited no decisions, however, and we know of none, where the Board has held that an employee's use of obscenity to a supervisor on the production floor, following a question concerning working conditions, is protected as would be a spontaneous outburst during the heat of a formal grievance proceeding or in contract negotiations. To the contrary, the Board and the courts have recognized (as did the Administrative Law Judge in passing) that even an employee who is engaged in concerted protected activity can, by opprobrious conduct, lose the protection of the Act.[15]

The decision as to whether the employee has crossed that line depends on several factors: (1) the place of the discussion; (2) the subject matter of the discussion; (3) the nature of the employee's outburst; and (4) whether the outburst was, in any way, provoked by an employer's unfair labor practice.

To reach a decision, the Board or an arbitrator must carefully balance these various factors.

Here the arbitrator considered the factors which the Board considers, and concluded that the employee's discharge was warranted and based on reasons not repugnant to the Act.[16] He noted that the incident

---

that case the court held that an employee's use of obscenity during an organizational campaign was protected. That situation is very different from the one herein.

[13] 139 NLRB 1516 (1962).

[14] 157 NLRB 1295 (1965).

[15] *Hawaiian Hauling Service, Ltd.*, 219 NLRB 765, 766 (1975).

[16] By contrast, in *Sea-Land Service, Inc.*, 240 NLRB 1146 (1979) (Member Penello dissented), Member Truesdale concurred with Chairman Fanning and Member Jenkins in finding that the arbitrator's decision on an issue similar to that presented here was repugnant to the Act. In *Sea-Land*, an employee had filed a grievance following a reprimand for his work, and then the employer disciplined him in writing for having filed the grievance. The employee was presented with the discipline letter at a meeting with the supervisors over the grievance. When the employee saw the letter, he stated:

. . . [T]he company must be crazy if they think that they can give [me] instructions like this. [I] can stand on the highest mountain shouting anything [I] want to about the President of the United States . . . . [I] could say anything [I] wanted to anybody anytime [I] wanted to, and, Kay Miller, you must be out of your f— mind if you think you can change me.

He was summarily discharged for that outburst, and his discharge was upheld by an arbitrator. Member Truesdale refused to defer in that instance because the outburst occurred away from the production floor, it concerned a formal grievance, and, most significantly, the outburst was provoked, as

---

[9] These employees testified on behalf of the Union. Only one of them testified at the hearing before the Administrative Law Judge.

[10] Contrary to the Administrative Law Judge, the arbitrator's findings were not based on a crediting of the testimony of the supervisor. While Respondent urged the arbitrator to credit the supervisor, the arbitrator made his factual findings on the basis of the corroborated testimony of all of the witnesses.

[11] We specifically repudiate our concurring colleague's misinterpretation of our opinion herein. Contrary to his statement, we neither agree nor disagree with the arbitrator's determination—our sole consideration is whether the arbitrator passed on all relevant aspects of the matter now before us and reached a conclusion which is not repugnant to the Act, in accord with *The Kansas City Star Company, supra*.

[12] The cases cited by the Administrative Law Judge were *Thor Power Tool Company*, 148 NLRB 1379 (1964), enfd. 351 F.2d 584 (7th Cir. 1965) (grievance meeting in employer's office); and *Crown Central Petroleum Corporation v. N.L.R.B.*, 430 F.2d 724 (5th Cir. 1970) (grievance proceeding). He also cited *N.L.R.B. v. Cement Transport, Inc.*, 490 F.2d 1024 (6th Cir. 1974). In

occurred on the production floor during working time (not at a grievance meeting), that the employee's question about overtime expressed legitimate concern which could be grieved, and that the supervisor had investigated and answered his question promptly; but, nevertheless, the employee had reacted in an obscene fashion without provocation and in a work setting where such conduct was not normally tolerated. He further considered the employee's past record and concluded that, considered together, this record established a reasonable basis for the discharge.[17]

We find nothing in the arbitrator's decision that is repugnant to the Act. Indeed, a contrary result in this case would mean that any employee's offhand complaint would be protected activity which would shield any obscene insubordination short of physical violence. That result would not be consistent with the Act. Accordingly, we conclude that it will effectuate the purposes of the Act to give conclusive effect to the grievance award, and, on that basis, we shall dismiss the complaint in its entirety.

### ORDER

Pursuant to Section 10(c) of the National Labor Relations Act, as amended, the National Labor Relations Board hereby orders that the complaint herein be, and it hereby is, dismissed in its entirety.

MEMBER PENELLO, concurring:

For somewhat different reasons than my colleagues, I agree that this case should be deferred to the arbitration award which found that grievant Chastain had been discharged for cause; i.e., insubordination. The question before the arbitrator was essentially the same as the unfair labor practice issue herein; i.e., whether Chastain's conduct was so opprobrious as to make Chastain unfit for further employment. The arbitrator found that it was:

> But the use of insulting obloquous [sic] language ["m— f— liar" or "lying son-of-a-bitch"] to other employees about their supervisor in the hearing of the supervisor cannot be regarded as "mere disrespect." On the contrary it shows a willful disregard for constituted industrial authority, a challenge to the dignity and character of the foreman, a derrogation [sic] of the authority necessary to direct the working forces.

The arbitrator found that Chastain was discharged because he cursed his supervisor and that, under the circumstances, Chastain had thereby crossed the line

separating acceptable from unacceptable behavior. On this basis, and this basis alone, I find that the arbitrator's award is not clearly repugnant to the purposes and policies of the Act. As the other *Spielberg* standards are not at issue, I would accordingly defer to the award. In my opinion, further consideration or analysis is neither necessary nor warranted. See my dissents in *Hawaiin Hauling Service, Ltd.*, 219 NLRB 765, 767 (1975); *Clara Barton Terrace Convalescent Center*, 225 NLRB 1028, 1029 (1976); *Ad Art, Incorporated*, 238 NLRB 1124 (1978); and *Sea-Land Service, Inc.*, 240 NLRB 1146 (1979).

My colleagues go to some length to distinguish the instant case from those cited above. Yet each case involves an arbitration award which found that the grievant had cursed a management official under circumstances in which such behavior was unacceptable. Of course there are differences in the cases, but they are differences of degree rather than kind. The only real distinction my colleagues have made is that they believe the arbitrator herein has made the right decision—that his award fully squares with Board precedent, that he applied the precise determinants of what is unacceptable behavior, and, ultimately, that his award reached a result with which they agree. My colleagues' standard for deferral is, thus, whether the award is in accord with the Act and Board precedent rather than the *Spielberg* standard of whether the award is clearly repugnant to the Act or wholly at odds with Board precedent. My colleagues' mistake, I believe, is that they first look to the unfair labor practice complaint and hearing rather than to the arbitration award. In my view, my colleagues have not "deferred" to the arbitrator's award but have "adopted" it as if the arbitrator were some sort of unofficial administrative law judge. Deferral under such a standard furthers neither the aim nor the efficient administration of the Act but encourages full litigation before the Board of deferrable disputes. Strict attention to *Spielberg* standards would, however, further the purposes of the Act by encouraging the reliance on collective-bargaining and its correlative offspring, grievance arbitration. Accordingly, I would *defer* to the arbitration award herein and dismiss the complaint in its entirety.

### DECISION

#### A. *Statement of the Case*

WALTER H. MALONEY, JR., Administrative Law Judge. This case came on to be heard before the undersigned in Atlanta, Georgia, upon an unfair labor practice complaint,[1] issued by the Regional Director for Region 10, which al-

---

found by the arbitrator, by the employer's own unfair labor practice—disciplining the employee for filing a grievance. Thus, in his view, the arbitrator's result was not consistent with Board law.

[17] Member Murphy did not participate in *Sea-Land Service, Inc.*, *supra*, and finds it unnecessary to express a position on that holding at this time.

[1] The principal docket entries in this case are as follows: Charge filed herein by Kenneth Chastain, an individual, against Respondent on May 2,
(*Continued*)

818                                DECISIONS OF NATIONAL LABOR RELATIONS BOARD

leges that the Respondent, Atlantic Steel Company,[2] violated Section 8(a)(1) and (3) of the Act. More particularly, the complaint alleges that Respondent discharged Charging Party Kenneth Chastain because Chastain was engaging in concerted, protected activities and in union activities. Respondent maintains that Chastain was discharged for cursing a supervisor and that the Board, under its *Spielberg* doctrine[3], should defer to an arbitrator's award which upheld the discharge. Upon these contentions the issues herein were drawn.[4]

### B. The Unfair Labor Practices Alleged

For many years Respondent has operated a steel fabricating plant in Atlanta, Georgia. It employs between 1,050 and 1,125 employees in its production and maintenance unit. For more than 30 years, Respondent has maintained a collective-bargaining relationship in this unit with Local 2401 of the United Steelworkers of America. Its most recent contract with the Union became effective on August 1, 1977, for 3 years. At the same time that the parties concluded a collective-bargaining agreement of general application, they also conclude a supplemental unemployment benefit plan agreement governing the same bargaining unit for the same period of time.

Respondent has maintained a supplemental unemployment benefit plan (SUB) for its unit employees, in accordance with which it was formerly obligated to contribute an amount equal to 5 cents per hour per employee up to a stated ceiling. When unit employees were laid off, the Company supplemented their unemployment compensation checks from this fund. In the winter of 1976–77, the fund went dry because of a large number of layoffs and a substantial number of short work weeks due to cold weather. As a result, Respondent posted a notice at the plant in January or February advising employees of the condition of the fund. It also discussed the problem with Union officials. The SUB fund was the subject of negotiations in the summer of 1977, in the course of which the Company agreed to an 8-cent-per-hour per employee contribution and a higher fund ceiling.

Kenneth Chastain, the Charging Party in this case, started to work for the Respondent in 1973. At the time of his discharge on November 4, 1977, he was employed as a galvanizer helper in the Mill Galvanizing Department. His immediate foreman was Ruzzie Mitchell, who is familiarly known as "Rev." I credit Chastain's testimony that, in the

fall of 1977, he and other employees in the Mill Galvanizing Department were unhappy about the operation of the fund, so Chastain circulated a petition at the plant, directed toward the Union, asking the Union to discuss the SUB fund problem at a union meeting. He collected about thirty signatures on the petition. I also find that his foreman, Mitchell, was aware that Chastain was circulating this petition.[5]

Chastain asserts that, during this same period of time, he was having difficulty with Mitchell, a difficulty he attributes to Mitchell's resentment of his effort in circulating a petition. Specifically, Chastain complains that Mitchell poked him in the chest while speaking to him and later bumped into him deliberately. He testified that Mitchell followed him and his Shop Steward Joe R. Garrett to the bathroom and criticized them for spending excessive amounts of time therein. Chastain also complains that Mitchell required him to place an inspection tag on a roll of fence which Chastain felt was defective, thereby making Chastain liable for a possible conduct memorandum (written reprimand) in the event that the purchaser of the fence returned it as defective. On November 2, the day before the incident which triggered his discharge, Chastain filed a grievance against Mitchell for harassment.

For its part, Respondent was less than enchanted with Chastain. During his 4-1/2 year tenure, he received disciplinary warnings for absenteeism and slowness on the job. He was also given a layoff for refusing to follow his foreman's orders respecting the use of a sledge hammer to knock certain angles in line, and another layoff for cursing in the presence of female office employees. This latter incident was taken to arbitration, at which the arbitrator upheld the Company's action while reducing the layoff from 2 days to 1 day.

On November 3, Chastain learned that a probationary employee named Cook had been given overtime by Mitchell while others, including himself, who worked under Mitchell's supervision and who had greater seniority, had been bypassed. Chastain felt that this assignment was a contract violation[6] and complained to Mitchell about his

---

[5] Mitchell was an unreliable and evasive witness. He denied at the hearing in this case that he knew Chastain was circulating a petition. He even denied knowing that the fund had run dry or that any problem had arisen concerning it. Respondent's witness Ronald J. Dervales, when pressed, admitted that Mitchell had stated at an earlier arbitration hearing that, in fact, he had been aware that Chastain had been circulating a petition on a clipboard.

[6] The contract provision relating to incidental overtime states:

The procedure for filling day-to-day temporary vacancies involving overtime is established in accordance with the provisions of Section 6.7 of the Collectively Bargained Contract, and is applicable to the following departments and occupations where specified:

\*     \*     \*     \*     \*

#### Mill Galvanizer

1. Sequence to be followed when there is an operating turn immediately preceding the turn on which the vacancy exists:

(a) By an Employee performing the assignment on the turn immediately preceding the turn on which the vacancy exists.

(b) By a qualified Employee from the turn immediately preceding the turn on which the vacancy exists, in the order of descending Occupational Seniority, starting with the occupation next below the vacancy. Such Employee doubling over with double on the occupation he worked the preceding turn, and the Employee scheduled to work that occupa-

---

[1] 1978; complaint issued on May 23, 1978; Respondent's answer filed on May 31, 1978; hearing held in Atlanta, Georgia, on October 17, 1978; briefs filed by the Charging Party and Respondent with the undersigned on or before November 13, 1978.

[2] Respondent admits, and I find, that it is a corporation which maintains an office and factory in Atlanta, Georgia, where it is engaged in the manufacturing of chain link fence and other steel products. During the preceeding calendar year, Respondent has shipped from its Atlanta, Georgia, place of business directly to points and places outside the State of Georgia goods and merchandise valued in excess of $50,000. Accordingly, Respondent is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act. Local 2401, United Steelworkers of America, AFL–CIO, is a labor organization within the meaning of Sec. 2(5) of the Act.

[3] *Spielberg Manufacturing Company*, 112 NLRB 1080.

[4] The transcript herein is hereby corrected.

loss of overtime and the assignment of overtime without regard to seniority. Mitchell said he would check up on the matter and get back to Chastain. Mitchell went to the office and spoke with Alton Beck, another foreman, and returned a few minutes later to the spot where Chastain was working. Two other employees, Shop Steward Garrett and Robert Dougherty, were also working in the same vicinity. I credit Chastain that Mitchell replied to Chastain's complaint by telling him that in fact Mitchell had asked Chastain to work overtime. Chastain denied this assertion and asked Mitchell if he had also asked all the other employees to work overtime. Mitchell replied that he had done so. Dougherty and Garrett denied Mitchell's assertion, whereupon Mitchell threw up his hands, turned, and walked away. When Mitchell had walked about 15 feet from where these employees were working, Chastain spoke to Garrett, asked if he had "gotten . . . down" what Mitchell had said, and asked Garrett if he had "heard that lying s.o.b.?"[7] Mitchell turned around and ordered Chastain to come to the office with him. Chastain insisted on being accompanied to the office by a union representative, so Mitchell agreed to permit Garrett to be present. At the office, Mitchell called a security guard. When the guard arrived, he told the guard that he was suspending Chastain, subject to discharge, for calling him "a lying s.o.b." and asked the guard to remove Chastain from the premises. The guard complied with the request.

Mitchell made a written notation of the incident in Chastain's personnel file and also reported it orally to his immediate superior, Bruce Davis, the superintendent of warehousing and shipping. On the following day, a meeting took place between Davis, Personnel Director Dervales, and Mill Superintendent Robert Mills. They reviewed the incident in question, as well as Chastain's personnel record, and thereafter they decided to discharge Chastain. Dervales testified that the decision was somewhat difficult since the Company had never before discharged an employee for cursing.[8] The Union filed a grievance over the discharge and took the matter to arbitration before James P. Whyte, a professor of law at William and Mary Law School and one of the two regular arbitrators who hear cases arising under the contract between Respondent and the Union. On January 6, 1978, Professor Whyte rendered an award upholding the discharge of Chastain. The award was based on the contract rather than upon the provisions of the Act. Professor Whyte stated that the case before him turned upon the credibility of witnesses who told divergent stories concerning the events which precipitated the discharge. He preferred Mitchell's version, found that Mitchell's recitation of the facts spelled out a case of insubordination, and decided that the Company was justified in attaching the penalty of discharge to the infraction of the contract so found because of Chastain's history of misconduct as an employee.

tion will "push up" if qualified, as will qualified Employees above him until the vacancy is filled.

(c) By an Employee qualified to perform the assignment.

[7] Chastain denies using the epithet "s.o.b." I credit Mitchell to the effect that Chastain did use that term.

[8] Unlike the arbitrator, I take it as well established that the use of profane and obscene language is commonplace among supervisors and employees alike at Respodent's plant, as indeed it is in almost any industrial setting

## C. Analysis and Conclusions

Normally remarks made by employees during the course of a grievance meeting or collective bargaining constitute protected activity, even though they may include profane or disrespectful language. The reason for this rule was set out by the Fifth Circuit in *Crown Central Petroleum Corporation v. N.L.R.B.*, 430 F.2d 724, 731 (1970):

> It has been repeatedly observed that passions run high in labor disputes and that epithets and accusations are commonplace. Grievance meetings arising out of disputes between employer and employee are not calculated to create an aura of total peace and tranquility where compliments are lavishly exchanged. . . .
>
> . . . a grievance proceeding is not an audience, conditionally granted by a master to his servants, but a meeting of equals—advocates of their respective positions. . . .
>
> We seek neither to rank improprieties or epithets, nor to unnecessarily generalize for a class of cases peculiarly tied to their facts. However, within the confines of a grievance meeting, it would require severe conduct indeed to convince us that the interest of fair give and take between equal parties to bargaining could be justifiably submerged.

There is an exception to this rule for statements which are so opprobrious as to make the employee unfit for further service. In a plant where obscenity and profanity of speech are commonplace, this exception could hardly apply to Chastain's statement to Garrett about Mitchell. The fact that an employee's language is inaccurate or questions the veracity of an employer does not remove the protective mantle of Section 7 of the Act. *Walls Manufacturing Company, Inc. v. N.L.R.B.*, 321 F.2d 753 (D.C. Cir. 1963). Thus, calling an employer a damned liar,[9] an s.o.b.,[10] or a horse's ass[11] during a grievance discussion have been held not to be so outrageous as to destroy an employee's protection under Section 7. The Board and the courts have gone so far as to hold that strong language about an employer, uttered by an employee to other employees during the course of an organizing effort, is entitled to similar recognition and protection. *N.L.R.B. v. Cement Transport Co., supra.* A complaint made by an employee to a union representative for the purpose of enforcing the provisions of an existing collective bargaining agreement amounts to a grievance in the course of which statements made by the employee are entitled to statutory protection in the absence of outrageous or opprobrious language. There is no requirement that the remarks be uttered during a formal meeting, held pursuant to contract provisions, before the conditional immunity outlined above comes into play. *Interboro Contractors, Inc.*, 157 NLRB 1295 (1966); *Bunney Brothers Construction Company*, 139 NLRB 1516 (1962).

The context of the remarks for which Chastain was discharged was Mitchell's asserted misapplication or violation

[9] *Crown Central Petroleum Corp., supra.*

[10] *N.L.R.B. v. Cement Transport Company*, 490 F.2d 1024 (6th Cir. 1974).

[11] *Thor Power Tool Company*, 148 NLRB 1379 (1964), entd. 351 F.2d 584 (7th Cir. 1965).

DECISIONS OF NATIONAL LABOR RELATIONS BOARD

of the contract (and related written understandings) concerning manner in which overtime must be assigned. Thus, his initial remarks to Mitchell were a grievance in the generic sense of the word. On two occasions, Mitchell had assigned overtime to the least senior employee in a fourteen-member crew. Chastain, among others, was unhappy about this action.[12] When Chastain expressed his opinion that this was contract violation, Mitchell gave him a response which he found unsatisfactory, whereupon Chastain turned to his shop steward and suggested that Garrett make a note of Mitchell's reply, namely Mitchell's claim that he had offered overtime to the other members of his crew before offering it to a probationary employee. This request could have no other meaning than a suggestion to Garrett to institute a formal written grievance against Mitchell. In the course of this coversation, Chastain called Mitchell a lying s.o.b. While this expression of contempt was uttered on the floor of the plant rather than in a company office or across the table at a formally convened and structured grievance meeting, it was certainly made to express disagreement concerning a possible contract violation and as the first step in preparing to take further action to enforce the contract. Under a long line of Board and court cases cited above, Chastain was engaged in protected, concerted activity when he made the statements concerning Mitchell, and such remarks are part of the *res gestae* of this activity. Accordingly, when Respondent discharged Chastain for uttering these remarks, he violated Section 8(a)(1) and (3) of the Act.[13]

## 1. The deferral to arbitration

The Board has long maintained a rule that it will defer to the award of an arbitrator which arises from proceedings which are fair and regular and in which all parties have agreed to be bound by the decision, if the decision of the arbitrator is not clearly repugnant to the purposes and policies of the Act. *Spielberg Manufacturing Co., Inc., supra.* The procedural approach used by the Board in determining whether or not to defer to an award was recently explicated in Member Truesdale's concurring opinion in *The Kansas City Star Company,* 236 NLRB 866, 869 (1978).

> On the other hand, the majority's approach—used in part by my dissenting colleagues—preserves the purpose and doctrine of *Spielberg.* The majority reviews the record evidence, sees no irregularities in the proceedings and no facial errors in the arbitrator's legal conclusion and to see if, on the facts he has found, it is consistent with Board law. Finding that it is, and that the arbitrator has actually considered Board law in ruling on all of the discharges—including Ellis—the majority defers to the arbitrator's decision. This approach is more consistent not only with past *Spielberg* deci-

[12] In deciding this case, I intimate no opinion as to whether Chastain or Mitchell was correct concerning the merits of the dispute over the proper manner of assigning overtime.

[13] Normally, where an employee who holds no union office is discharged under these circumstances, the violation is regarded as an infringement of Sec. 8(a)(1). Where, as here, the employee is seeking to enforce the terms of a union-negotiated contract, the discharge amounts to an 8(a)(3) violation as well.

sions, but also with the strong labor policy which favors voluntary arbitration.

The question arising here is whether Professor Whyte's decision of January 6, 1978, is repugnant to the purposes and policies of the Act because it does not address or resolve the unfair labor practice which is at issue in this case.[14]

Beginning with *Monsanto Chemical Company,* 130 NLRB 1079 (1961), the Board has refused to defer to arbitration awards when the decision of the arbitrator fails to address and resolve the unfair labor practice allegation which is at issue before the Board. In *Raytheon Company,* 140 NLRB 883 (1963), the arbitrator addressed himself exclusively to the contract issue presented to him by the grievant and took no evidence which would permit him to evaluate the presence or absence of an unfair labor practice. The Board refused to accept his award as dispositive because he failed to undertake a resolution of the unfair labor practice which had been alleged in the Board case. Other and later cases, involving both discharges and various aspects of the statutory duty to bargain in good faith, have adopted the same rationale. *Clara Barton Terrace Convalescent Center,* 225 NLRB 1028 (1976); *Ryder Technical Institute,* 199 NLRB 570 (1972); *The Kroger Company,* 226 NLRB 512 (1976); *Alfred M. Lewis, Inc.,* 229 NLRB 757 (1977).

Where the Board has improperly deferred to arbitration awards, the courts have intervened to require it to perform its statutory duty. Thus, in *Banyard* v. *N.L.R.B.,* 505 F.2d 342 (1974), the D.C. Circuit remanded a case to the Board for determination on the merits as to whether an employee's refusal to work was protected under Section 502 of the Act, because the arbitrator failed to do so and the Board had refused to inquire into the merits of the award. In *Stephenson* v. *N.L.R.B.,* 550 F.2d 535 (1977), the Ninth Circuit remanded a case to the Board for a determination on the merits because the Board had improperly deferred to an arbitration award which was vague on the issue of whether the arbitrator had decided the unfair labor practice claim, and because "the record is bare as to whether the arbitration panel was willing or able to consider the unfair labor practice charge." 550 F.2d at 546.

If we apply Board Member Truesdale's procedural approach to the arbitration award at hand, we find that most of the evidence presented in this case was also presented to the arbitrator. We also find that the arbitrator confined his decision to legal issues arising under the contract and failed to mention, even in passing, the legal issue as to whether the facts found amounted to an unfair labor practice. Without in any way disturbing the arbitrator's credibility findings or his factual analysis, it is clear from facts he found that this

[14] The General Counsel does not argue that the arbitration proceedings were attended by any procedural irregularities. It appears from the record that Chastain requested permission of the Union to permit his own personal attorney to appear at the arbitration hearing and that the Union denied him such permission. It further appears that Chastain rejected the services of the Union's regularly retained counsel and preferred that his case be presented by the Union's business agent rather that the Union's lawyer. The denial of the right to be represented by an attorney of one's own choice, where the expense of retaining the attorney is borne by the grievant, is a serious procedural irregularity. However, it does not appear that either Respondent or the arbitrator was responsible for preventing the appearance of Chastain's lawyer, and it would be unfair to set aside an award in Respondent's favor because of something which the Union did.

Respondent had invaded Chastain's rights under Section 7 of the Act. However, the arbitrator failed to arrive at this conclusion. The Board cannot deprive employees of statutory rights by depriving them of a forum in which to redress those rights. If an arbitrator's award is to merit deference, it must own up to standards of employer conduct laid down by Congress and applied by the Board and the courts. When an award fails to meet such standards, it is repugnant to the purposes and policies of the Act. Even though it may be in consonance with the terms of a collective bargaining agreement, it cannot serve as a barrier preventing the Board from performing its statutory duty.

Upon the foregoing findings of fact, and upon the entire record herein considered as a whole, I make the following:

### CONCLUSIONS OF LAW

1. Respondent Atlantic Steel Company is an employer engaged in commerce within the meaning of Section 2(2), 2(6) and 2(7) of the Act.

2. Local 2401, United Steelworkers of America, AFL–CIO, is a labor organization within the meaning of Section 2(5) of the Act.

3. By discharging Kenneth Chastain because he engaged in concerted, protected activities and in union activities, Respondent herein violated Section 8(a)(1) and (3) of the Act.

4. The unfair labor practices recited above in Conclusion of Law 3 have a close, intimate, and substantial effect on the free flow of commerce within the meaning of Section 2(6) and 2(7) of the Act.

### THE REMEDY

Having found that Respondent has committed certain unfair labor practices, I will recommend that it be ordered to cease and desist therefrom and to take other actions designed to effectuate the purposes and policies of the Act. As a discharge for engaging in union activities and in concerted protected activities goes to the heart of the Act, I will recommend that the Board issue a so-called broad 8(a)(1) order designed to suppress any and all violations of that section of the Act. *J. C. Penney Co., Inc.*, 172 NLRB 1270, fn. 1 (1968). The recommended order will also provide that the Respondent be required to reinstate Kenneth Chastain to his former or substantially equivalent employment and to make him whole for any loss of earnings which he may have suffered by reason of the action it took, in accordance with the *Woolworth*[15] formula, with interest thereon computed in accordance with the adjusted prime rate used by the Internal Revenue Service for tax payments. *Florida Steel Corporation*, 231 NLRB 651 (1977); *Isis Plumbing & Heating Co.*, 138 NLRB 716 (1962). I will also recommend that the Respondent be required to post a notice, advising its employees of their rights and of the remedy in this case.

[Recommended Order omitted from publication.]

---

[15] *F. W. Woolworth Company*, 90 NLRB 289 (1950).

**Plaza Auto Center, Inc. *and* Nick Aguirre.**  Case 28–CA–22256

August 16, 2010

DECISION AND ORDER

BY CHAIRMAN LIEBMAN AND MEMBERS SCHAUMBER
AND PEARCE

On July 21, 2009, Administrative Law Judge Lana H. Parke issued the attached decision. The General Counsel filed exceptions and a supporting brief.

The National Labor Relations Board has delegated its authority in this proceeding to a three-member panel.

The Board has considered the decision and the record in light of the exceptions and brief and has decided to affirm the judge's rulings, findings,[1] and conclusions only to the extent consistent with this Decision and Order, and to adopt the recommended Order as modified and set forth in full below.[2]

The General Counsel excepts to the judge's dismissal of the complaint allegation that the Respondent unlawfully discharged employee Nick Aguirre following his outburst at a meeting with the Respondent's owner and sales managers. The General Counsel contends that Aguirre was engaged in protected concerted activity at the meeting and that his outburst was not so egregious as to lose the protection of the Act under *Atlantic Steel Co.*, 245 NLRB 814 (1979). We find merit in the exceptions.

Facts

The Respondent, which sells preowned automotive vehicles, hired Aguirre in August 2008 as a salesperson.[3] On his first day of work, the Respondent was conducting one of its periodic tent sales in a Sears parking lot. When Aguirre inquired as to what restroom he should use during the sale, his coworkers laughed and pointed in various directions. Sales Manager Juan Felix pointed toward the Sears store and a gas station across the street. At a sales staff meeting the following week, Aguirre asked whether the Respondent gave employees a break and a meal during the tent sales, and Felix responded, "You're always on break, buddy . . . you just wait for customers all day," adding that if Aguirre did not like the

way that the Respondent operated, he could leave at any time.

At the next tent sale, Aguirre asked other employees about the Respondent's compensation system, and they told him that the salesmen were paid straight commission with no guaranteed minimum. Aguirre also discussed how the salespeople could alternate restroom breaks. However, when he asked Felix if he could take a break to eat and use the restroom, Felix refused, again telling Aguirre that if he did not like it he could leave. Felix also reiterated to Aguirre and the other salesmen that they were always on break.

At the next sales staff meeting, another employee raised the subject of pay. Sales Manager Gustavo Mac-Grew responded that if the employees did their jobs right, including following procedures, doing test drives, and completing paperwork, and did not give cars away for free, they would make money. When Aguirre sold a vehicle listed on the Respondent's Flat List[4] as carrying a commission of $1000–$2000, he was surprised to receive a check for only $150 gross. His colleagues agreed that the amount was unfairly low, and Aguirre confronted Felix, who replied that the Respondent had given the vehicle away almost for free.

During a later sales staff meeting, the Respondent's owner, Tony Plaza, mentioned that there were scratches on a vehicle and threatened to deduct the repair cost from all of the salesmen's pay unless the person responsible came forward. Aguirre asserted that the cost should instead be shared by all employees who had access to the vehicle. At the same meeting, Plaza raised the subject of employee negativity, stating that he had a stack of applications from which he could easily hire. Employee Oscar Martinez brought up breaks and meal periods, adding that Felix had been disrespectful when Martinez asked about them. Plaza answered that the Respondent was trying to work out the break issue.

In October, Aguirre told Felix that he wanted to know which cars carried a good commission, because he thought that the Respondent was stealing his money. Felix answered that if Aguirre did not trust the Respondent, he was welcome to go elsewhere.

Aguirre subsequently contacted a State wage and hour agency. He told his coworkers that the "Labor Commission" said that employees should get minimum wage as a draw against commissions and that he would inform Office Manager Barbara Montenegro after he obtained more information. On October 28, Aguirre asked Montenegro whether salesmen were entitled to a minimum

---

[1] The General Counsel has excepted to some of the judge's credibility findings. The Board's established policy is not to overrule an administrative law judge's credibility resolutions unless the clear preponderance of all the relevant evidence convinces us that they are incorrect. *Standard Dry Wall Products*, 91 NLRB 544 (1950), enfd. 188 F.2d 362 (3d Cir. 1951). We have carefully examined the record and find no basis for reversing the findings.

[2] We have modified the conclusions of law, amended the remedy, and substituted a new notice for that of the administrative law judge.

[3] All dates are 2008 unless otherwise indicated.

[4] The Flat List shows vehicles that have been on the lot for an extended time and predetermined commissions intended as an incentive for the salesmen to sell those vehicles.

355 NLRB No. 85

494

DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

wage draw, and she replied that the Respondent did not pay minimum wage and that, if he wanted a minimum wage job, the sales job was not the job for him. Aguirre told her that he had spoken with the State Labor Board and asked if she could find the answer, perhaps by asking Plaza.

On the same afternoon, Felix called Aguirre into his office to meet with Plaza, Felix, and MacGrew. Felix had just informed Plaza that Aguirre complained about everything, including not trusting the Respondent concerning commissions and not knowing the Respondent's cost of vehicles. Plaza began the meeting by stating that Aguirre was "talking a lot of negative stuff" that would negatively affect the sales force. Aguirre said that he had questions about vehicle costs, commissions, and minimum wage. Plaza admitted responding that Aguirre needed to follow policies and procedures, including the pay structure, and that he should not be complaining about pay. He added that car salesmen normally did not know the cost of vehicles. At least twice, Plaza said that if Aguirre did not trust the Respondent, he did not need to work there. Aguirre became upset and told Plaza that he was an "F'ing mother F'ing," an "F'ing crook," and "an asshole," and that he was stupid, nobody liked him, and everyone talked about him behind his back. At one point, Aguirre stood up in the small office, pushed his chair aside, and said that, if he was fired, Plaza would regret it. Following Aguirre's outburst, Plaza fired him. The judge found that the Respondent had discharged salesman Eddie Yemes in 2008 for telling Felix at a tent sale to "f— himself."

### Discussion

As an initial matter, the judge determined that Aguirre's questioning of the Respondent's policies concerning breaks, restroom facilities, and compensation constituted protected concerted activity under the Act. Moreover, she found that the Respondent's statements in response to Aguirre's inquiries, that if he disliked the Respondent's policies he did not need to work there, violated Section 8(a)(1). No party excepted to these findings. The judge further found that the Respondent terminated Aguirre because of his outburst toward Plaza. We adopt these findings. We also adopt the judge's findings of fact concerning the October 28 meeting, which are largely based on her assessment of credibility.

### The *Atlantic Steel* Analysis

Because Aguirre's outburst occurred at a meeting held in the context of his protected concerted activity, the judge applied the test set forth by the Board in *Atlantic Steel*, 245 NLRB 814, 816 (1979), for determining whether the conduct was so egregious as to lose the pro-

tection of the Act.[5] In *Atlantic Steel*, the Board identified four factors to be balanced in the determination: (1) the place of the discussion, (2) the subject matter of the discussion, (3) the nature of the employee's outburst, and (4) whether the outburst was, in any way, provoked by the employer's unfair labor practices. As the judge here correctly observed, the Act allows some latitude for impulsive conduct by employees in the course of protected concerted activity, but, at the same time, recognizes that employers have a legitimate need to maintain order.[6] The balance between these policy concerns lies at the heart of the *Atlantic Steel* analysis.

*Factors 1, 2, and 4:* We agree with the judge that the first, second, and fourth *Atlantic Steel* factors favor a determination that Aguirre's conduct was protected. With respect to the first factor, the place of the discussion, the meeting took place in Felix's office, in the presence of only management officials. Montenegro, whose office is adjacent to Felix's, testified that she could hear Aguirre speaking in a loud voice but could not hear what he was saying. Under these circumstances, his outburst could not have undermined workplace discipline at the Respondent's facility. As to the second factor, the subject matter of the discussion, the discussion involved Aguirre's protected concerted activity of raising questions about terms and conditions of employment, particularly the Respondent's policies pertaining to breaks and compensation. Finally, with regard to the fourth factor, whether the employee was provoked, at least twice during the meeting, the Respondent reiterated to Aguirre its frequent warning that if he did not like the Respondent's policies he did not need to work there. The judge found, and we agree, that these statements were unlawful and provocative responses to Aguirre's inquiries. *Felix Industries*, supra, 331 NLRB at 145.

*Factor 3:* Contrary to the judge, we do not find that the third factor, the nature of the outburst, favors the loss of protection, or that this factor warrants an ultimate conclusion that Aguirre forfeited his Section 7 protections.

---

[5] The judge also analyzed Aguirre's discharge under the Board's test in *Wright Line*, 251 NLRB 1083, 1089 (1980), enfd. 662 F.2d 899 (1st Cir. 1981), cert. denied 455 U.S. 989 (1982). That test, however, provides a means of resolving questions of employer motivation. Here, it is undisputed that the Respondent terminated Aguirre because of his outburst in the October 28 meeting, which the judge found, and we agree, otherwise involved protected concerted activity. In such circumstances, *Atlantic Steel* provides the appropriate analysis. *Felix Industries*, 331 NLRB 144, 145–146 (2000), enfd. in relevant part 251 F.3d 1051 (D.C. Cir. 2001), supplemented 339 NLRB 195 (2003), enf. mem. 2004 WL 1498151 (D.C. Cir. 2004).

[6] *Tampa Tribune*, 351 NLRB 1324, 1324–1325 (2007), enf. denied sub nom. *Media General Operations v. NLRB*, 560 F.3d 181 (4th Cir. 2009); *NLRB v. Thor Power Tool*, 351 F.2d 584, 587 (7th Cir. 1965), enfg. 148 NLRB 1379, 1380 (1964).

The Board has found that communications in the course of protected activity are also protected unless they are "so violent or of such serious character as to render the employee unfit for further service." *St. Margaret Mercy Healthcare Centers*, 350 NLRB 203, 204–205 (2007) (citations omitted), enfd. 519 F.3d 373 (7th Cir. 2008). As the judge acknowledged, a single verbal outburst of insulting profanity does not exceed the bounds of the Act's protection. Thus, in *Burle Industries*, 300 NLRB 498 (1990), enfd. 932 F.2d 958 (3d Cir. 1991), the Board found that an employee did not forfeit protection when, in the course of encouraging employees to leave the facility due to a possible chemical spill, he called a supervisor a "f'ing asshole" for wanting employees to work despite the fumes. The judge there found that the employee overreacted when he believed that the supervisor was making light of the situation, but that the outburst was attributable to frustration and "animal exuberance" in the heat of the moment.

Here, the judge variously labeled Aguirre's "cursing and derogating" of Plaza as "belligerent," "menacing," and "at least physically aggressive if not menacing." Although we do not condone Aguirre's outburst toward Plaza, the judge's characterizations of it are inconsistent with her own factual findings and overstate its severity in light of the evidence. Because the judge's descriptions are unsupported by the record, we do not rely on them; instead we assess Aguirre's conduct based on the credited evidence.[7]

In context, we find that Aguirre's profanity was not so opprobrious as to deprive him of statutory protection. Prior to the October 28 meeting, Aguirre on several occasions expressed concerns about the Respondent's policies and stated that he believed that its compensation policies violated state wage and hour requirements. The Respondent consistently dismissed his inquiries, which it viewed as demonstrating a negative attitude that it did not want to influence other employees. Moreover, the Respondent's unlawful refrain that if Aguirre did not like its policies, he could quit invited a strong reaction from Aguirre, which finally occurred when Plaza repeated the

statement at the October 28 meeting.[8] Unlike the employee in *Burle Industries*, supra, Aguirre uttered more than a single profanity against Plaza. Nevertheless, his was a single and brief outburst provoked by Plaza's failure to respond to Aguirre's concerns and his invitation, once again, that Aguirre work elsewhere.[9] Moreover, according to Aguirre's unrebutted testimony, Felix had also used obscene language, including "the F word," on several occasions in addressing sales employees, sometimes in the presence of MacGrew. Therefore, the record shows that profane language was not outside the range of conduct at the Respondent's facility.[10]

We further find that Aguirre's statement that if Plaza fired him he would regret it was not a threat of physical harm. The statement itself did not refer to such harm in any way. In the context of Aguirre's recent inquiry to a State agency regarding the employees' entitlement to a minimum wage draw against commissions, it seems clear that Aguirre was threatening legal consequences. Furthermore, the record shows no evidence of any physical harm or threat thereof by Aguirre during his employment. Under these circumstances, we find it much more likely that Aguirre was threatening to report the Respondent's practices to State authorities than to retaliate against the Respondent through violence.

---

[7] Our dissenting colleague would accept the judge's characterizations of Aguirre's conduct based on the premise that the judge was in a position to observe witnesses' representations of Aguirre's tone and body language, which are not apparent in the written record. However, it is the Respondent's responsibility to present on the record all relevant evidence supporting its position, including, where appropriate, testimony concerning a speaker's tone and gestures. The Respondent here has provided no such evidence that warrants the judge's descriptions of Aguirre's conduct. In addition, as discussed infra, the judge did not explain the basis of her findings, whether it be witnesses' nonverbal imitations of Aguirre's conduct or otherwise. Therefore, in reviewing the record based on the General Counsel's exceptions, we cannot rely on the judge's unexplained and unsupported characterizations.

[8] Plaza also admitted telling Aguirre at the meeting that he should not complain about the Respondent's pay structure. This statement was not separately alleged as unlawful.

[9] Compare *Aluminum Co. of America*, 338 NLRB 20, 21–22 (2002) (repeated incidents of ad hominem profanity against supervisor not emotional outburst provoked by officials of the employer and not within Act's protection).

In view of Plaza's invitation that Aguirre work elsewhere, and the judge's finding, with regard to the fourth factor, that Aguirre's outburst was provoked by Plaza, we find that the judge erred in stating that it occurred "[w]ithout extreme provocation from overt hostility or antagonism from [Plaza]."

The judge also cited the Respondent's September discharge of Yemes, whose misconduct she deemed less serious than Aguirre's because it was less extensive and not directed at the Respondent's owner. However, we do not find Yemes' discharge relevant to this case. As explained, the legality of Aguirre's discharge does not turn on the Respondent's motive or its past practice. Whether the Respondent discharged another employee in arguably comparable circumstances, lawfully or not, does not bear on whether Aguirre lost the protection of the Act.

[10] In finding that the Respondent satisfied its burden under *Wright Line* to show that it would have discharged Aguirre even in the absence of his protected concerted activity, the judge cited the Respondent's September discharge of Yemes for an arguably comparable outburst toward Felix at a tent sale. We do not find Yemes' discharge relevant to our decision. As explained, because the Respondent's motivation here is not at issue, the legality of Aguirre's discharge is appropriately analyzed under *Atlantic Steel* rather than *Wright Line*. Further, even if Yemes' discharge indicates that the Respondent did not tolerate obscene language on that occasion, the fact remains that such language was used in the Respondent's workplace, as demonstrated by Felix's own conduct.

496                                 DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

For these reasons, we disagree with the judge that Aguirre's verbal outburst was "belligerent," "physically aggressive," or "menacing." The judge also failed to identify any physical aggression that would support such a description, and we find none. In fact, the only physical movement by Aguirre that the judge found was his standing up and pushing aside the chair. However, even considering Aguirre's apparent frustration or anger during the meeting, it is not clear from the record, and the judge did not find, whether this was a hostile action or one of necessity in Felix's office, which Plaza testified was "really small," approximately 8 or 10 feet by 10 feet.[11] Moreover, neither Plaza's contemporaneous note nor the Respondent's position statement to the Board in response to the unfair labor practice charge referred to any physical conduct by Aguirre, and the judge found that the Respondent discharged him for his verbal attack, not for any physical threat.

Relying on the judge's findings of fact, we conclude that Aguirre's outburst, while vehement and profane, was brief and unaccompanied by insubordination, physical contact, threatening gestures, or threat of physical harm. Therefore, we find that his conduct did not render him unfit for further service and thus did not exceed the bounds of statutory protection under *Atlantic Steel*'s third factor.

Based on our determination that all of the *Atlantic Steel* factors weigh in favor of finding Aguirre's conduct in the October 28 meeting within the protection of the Act, we reverse the judge and conclude that the Respondent violated Section 8(a)(1) by discharging him.[12]

---

[11] In this regard, the judge acknowledged but did not resolve the inconsistencies in the testimony of the Respondent's witnesses. Thus, she did not determine whether Aguirre threw the chair (Felix), hit the desk (MacGrew), or "got on [sic] my face" (Plaza). None of these statements was corroborated by another witness, and the judge did not rely on them in her findings of fact.

[12] Cf. *Daimler-Chrysler Corp.*, 344 NLRB 1324, 1328–1328 (2005). In that case, as the judge found, only the second factor favored protection, and the Board found the employee's conduct repeated, profane, and insubordinate. Chairman Liebman dissented in *Daimler-Chrysler*. Member Pearce did not participate in that case and takes no position as to whether it was correctly decided.

Even assuming for the sake of argument that the third factor favors the loss of protection, the *Atlantic Steel* test requires a careful balancing of the four factors to determine whether the employee's conduct crossed the line of statutory protection. 245 NLRB at 816. On balance, we find that Aguirre's conduct did not cross that line. Factors 1, 2, and 4 clearly favor protection for the reasons discussed. Even if factor 3 favors depriving Aguirre of the Act's protection, we find that, in the circumstances here, it is outweighed by the other factors. We note particularly the absence of prior improper conduct, the Respondent's unwillingness to resolve the issues previously raised by Aguirre, and Plaza's provocation of the outburst. *Felix Industries*, 339 NLRB 195, 196–197 (2003).

AMENDED CONCLUSIONS OF LAW

1. The Respondent is an employer engaged in commerce and a business affecting commerce within the meaning of Section 2(6) and (7) of the Act.

2. The Respondent violated Section 8(a)(1) of the Act by telling employees that they could quit or leave the Respondent's employ if they did not like company policies and/or procedures.

3. The Respondent violated Section 8(a)(1) of the Act by discharging employee Mark Aguirre because he engaged in protected concerted activity in order to discourage other employees from exercising their rights under the Act.

4. The unfair labor practices set forth above affect commerce within the meaning of Section 8(a)(1) and Section 2(6) and (7) of the Act.

AMENDED REMEDY

We adopt the remedies recommended by the judge. In addition, having found that the Respondent violated Section 8(a)(1) by discharging employee Mark Aguirre because he engaged in protected concerted activity in order to discourage other employees from exercising their rights under the Act, we shall order the Respondent to offer Aguirre immediate reinstatement to his former job, or if that job no longer exists, to a substantially equivalent position, without prejudice to his seniority or any other rights and privileges previously enjoyed. We shall also order the Respondent to make Aguirre whole for any loss of earnings and other benefits suffered as a result of the discrimination against him. Backpay shall be computed in accordance with *F. W. Woolworth Co.*, 90 NLRB 289 (1950), with interest to be computed in the manner prescribed in *New Horizons for the Retarded*, 283 NLRB 1173 (1987). The Respondent shall also be required to expunge from its files any and all references to the discharge, and to notify Aguirre in writing that this has been done and that the discharge will not be used against him in any way.

ORDER

The National Labor Relations Board adopts the recommended Order of the administrative law judge as modified and set forth in full below and orders that the Respondent, Plaza Auto Center, Inc., Yuma, Arizona, its officers, agents, successors, and assigns, shall take the action set forth in the Order as modified.

1. Cease and desist from

(a) Telling employees that they can quit or leave the Respondent's employ if they do not like company policies and/or procedures.

(b) Discharging or otherwise discriminating against any employee because he engaged in protected concerted

PLAZA AUTO CENTER, INC.

activity in order to discourage employees from exercising their rights under the Act.

(c) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Within 14 days from the date of this Order, offer Nick Aguirre full reinstatement to his former job or, if that job no longer exists, to a substantially equivalent position, without prejudice to his seniority or any other rights or privileges previously enjoyed.

(b) Make Nick Aguirre whole for any loss of earnings and other benefits suffered as a result of the discrimination against him, as set forth in the Amended Remedy section of this Decision.

(c) Within 14 days from the date of this Order, remove from its files any reference to the unlawful discharge, and within 3 days thereafter notify the employee in writing that this has been done and that the discharge will not be used against him in any way.

(d) Within 14 days after service by the Region, post at its Yuma, Arizona facility copies of the attached notice marked "Appendix."[13] Copies of the notice, on forms provided by the Regional Director for Region 28, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. In the event that, during the pendency of these proceedings, the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since September 3, 2008.

(e) Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

MEMBER SCHAUMBER, dissenting.

I agree with my colleagues and the judge that the first, second, and fourth factors of the *Atlantic Steel*[1] analysis

favor a finding that Nick Aguirre's conduct was protected by the Act. As to the third factor, I would adopt not only the judge's findings concerning what occurred at the October 28, 2008 meeting, but also her assessment of the nature and seriousness of Aguirre's conduct. Therefore, I agree with the judge that the third factor does not favor protection. Moreover, like the judge, I would dismiss the complaint.

The critical evidence in this case is the testimony of Aguirre and the Respondent's officials, evidence that the judge is in a unique position to evaluate. Thus, based on her observation of the demeanor of the witnesses, the judge credited the testimony of the Respondent's officials over that of Aguirre. The majority has accepted this determination, in accordance with the Board's longstanding policy,[2] and I agree with my colleagues on this point.

However, the opportunity to view and evaluate witness demeanor is not the administrative law judge's only advantage. The judge also gains important insights from the manner in which testimony is conveyed, including the witnesses' representations of a speaker's tone and body language. The hearing transcript, on which the Board must rely, cannot adequately communicate these aspects of the witnesses' testimony. Therefore, in a case such as this, which turns primarily on Aguirre's words and actions in the October 28 meeting, I would not overturn the judge's characterization of the pivotal events unless the record included compelling evidence that she was wrong. I find no such evidence in this case.

In addition, I disagree with my colleagues that Felix's use of profanity toward employees and in MacGrew's presence indicates that the Respondent tolerated such language. Aguirre conceded in his testimony that Felix had never used profanity when Plaza was present. Moreover, Plaza's decision to discharge employee Eddie Yemes for uttering a single obscenity toward Felix shows that the Respondent in fact maintained a strict policy against profane language toward supervisors.

For the above reasons, I agree with the judge that the third factor of the *Atlantic Steel* analysis favors a finding that Aguirre forfeited the protection of the Act. Also like the judge, I find that, in balancing the test's four factors, substantial weight should be accorded to the third factor and, in cases of outrageous behavior, it can be determinative.[3] In my view, this is such a case. Plaza's statement that Aguirre could work elsewhere was unlawful but not

---

[13] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

[1] *Atlantic Steel Co.*, 245 NLRB 814 (1979).

[2] *Standard Dry Wall Products*, 91 NLRB 544 (1950), enfd. 188 F.2d 362 (3d Cir. 1951).

[3] *Stanford Hotel*, 344 NLRB 558, 559 fn. 7 (2005) (stating my agreement with Chairman Battista's dissent on this point in *Felix Industries*, 339 NLRB 195 (2003), enfd. per curiam D.C. Cir. 2004) (No. 03–1221, 03–1239)).

498                                   DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

extreme, and Aguirre's shouted profanity was far out of proportion to this provocation.   Accordingly, I would find that the Respondent lawfully discharged Aguirre under *Atlantic Steel*.

### APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

### FEDERAL LAW GIVES YOU THE RIGHT TO

> Form, join, or assist a union
> Choose representatives to bargain with us on your behalf
> Act together with other employees for your benefit and protection
> Choose not to engage in any of these protected activities.

WE WILL NOT tell employees that they can quit or leave our employ if they do not like our policies and/or procedures.

WE WILL NOT discharge or otherwise discriminate against any of you because you engage in protected concerted activities in order to discourage you from exercising your rights under the Act.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights guaranteed you by Section 7 of the Act.

WE WILL, within 14 days from the date of the Board's Order, offer Nick Aguirre full reinstatement to his former job or, if that job no longer exists, to a substantially equivalent position, without prejudice to his seniority or any other rights or privileges previously enjoyed.

WE WILL make Nick Aguirre whole for any loss of earnings and other benefits resulting from his discharge, less any net interim earnings, plus interest.

WE WILL, within 14 days from the date of the Board's Order, remove from our files any reference to the unlawful discharge of Nick Aguirre, and WE WILL, within 3 days thereafter, notify him in writing that this has been done and that the discharge will not be used against him in any way.

PLAZA AUTO CENTER, INC.

*Joel C. Schochet, Atty., for the General Counsel.*
*Alicia Z. Aguirre, Atty. (Law Office of Alicia Z. Aguirre, PLC),*
    of Yuma, Arizona, for the Respondent.

### DECISION

#### I. STATEMENT OF THE CASE

LANA PARKE, Administrative Law Judge.   Pursuant to charges filed by Nick Aguirre (Mr. Aguirre), an individual, the Regional Director of Region 28 of the National Labor Relations Board (the Board) issued a complaint and notice of hearing (the complaint) on January 30, 2009.   The complaint alleges that Plaza Auto Center, Inc. (the Respondent) violated Sections 8(a)(1) of the National Labor Relations Act (the Act).   This matter was tried in Somerton, Arizona, on May 5, 2009.[1]

#### II. ISSUES

1.  Did Respondent violate Section 8(a)(1) of the Act by discharging Mr. Aguirre on October 28?
2.  Did Respondent violate Section 8(a)(1) of the Act by threatening employees with unspecified reprisals and by inviting them to quit their employment?

#### III. JURISDICTION

At all relevant times, the Respondent, an Arizona corporation, has been engaged in the business of selling pre-owned automotive vehicles with an office and place of business in Yuma, Arizona (the Respondent's facility).[2]   In conducting its business operations during the 12-month period ending December 1, the Respondent derived gross revenues in excess of $500,000 and purchased and received at its facility goods valued in excess of $50,000, directly from points located outside the State of Arizona and from other enterprises located within the State of Arizona, each of which had received the goods directly from points outside the State of Arizona. I find Respondent has at all relevant times been an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

#### IV. STATEMENT OF FACTS

On the entire record, including my observation of the demeanor of the witnesses, and after considering the briefs filed by the General Counsel and the Respondent, I find the following events occurred in the circumstances described below during the period relevant to these proceedings:

The individuals named below, holding the stated positions with the Respondent, were supervisors within the meaning of Section 2(11) of the Act and comprised the management hierarchy of the Respondent:

| | |
|---|---|
| Tony Plaza Sr. (Mr. Plaza) | — Owner |
| Juan Felix (Mr. Felix) | — Sales Manager |
| Gustavo MacGrew (Mr. MacGrew) | — Sales Manager |
| Barbara Montenegro (Ms. Montenegro) | — Office Manager |

In its business, the Respondent utilized two shifts of sales personnel: 8 a.m. to 3 p.m. and 1 p.m. to 8 p.m. The Respondent had no employee break policy.[3]   Periodically the Respon-

---

[1] All dates are 2008, unless otherwise specified.
[2] Unless otherwise explained, findings of fact herein are based on party admissions, stipulations, and uncontroverted testimony.
[3] However, according to Mr. Felix, employees could take breaks "whenever they want to most likely."

dent held vehicle sales events at a Sears parking lot in Yuma (Sears tent sale) over 3-day weekends, commencing Friday and concluding Sunday. The Respondent's vehicle salespeople and supervisors staffed the Sears tent sales. The Respondent compensated its salespeople by commission only.[4] The Respondent maintained a "Flat List" of vehicles for sale, i.e., vehicles that were hard to sell, for sale of which the Respondent paid its sales personnel an incentive fee called a "flat commission." The Respondent commonly held sales staff meetings each Wednesday.

Mr. Aguirre began working for the Respondent at the end of August as a salesperson. His first day of work coincided with a Sears tent sale. In the course of his first day, Mr. Aguirre asked fellow salespeople what restroom facilities he was to use. Some laughed and pointed in various directions. When Mr. Aguirre asked Mr. Felix the same question, Mr. Felix pointed to an area across the street from the parking lot where the Sears store and a Circle K gas station were located.[5]

On the following Wednesday, Mr. Aguirre attended a sales staff meeting at the Respondent's facility along with other salespeople and Mr. Felix and Mr. MacGrew. At the meeting, Mr. Aguirre learned the company held the Sears tent sales every 2 weeks. Mr. Aguirre asked if employees were entitled to a break and a meal during the Sears tent sales. Mr. Felix said, "You're always on a break, buddy . . . you just wait for customers all day." Mr. Felix also said that if Mr. Aguirre did not like the way the company operated, he was welcome to leave at any time.

The Respondent held its next Sears tent sale in mid-September. At that sale, Mr. Aguirre discussed the Respondent's employee compensation system with other salespeople. They told him that compensation was straight commission with no income floor, i.e., a guaranteed minimum amount of compensation a salesperson earns within a specified time period. During the course of the sale, Mr. Aguirre discussed with two other salespeople how to alternate restroom breaks. Mr. Aguirre asked Mr. Felix if he could take a break to eat and use the restroom. Mr. Felix refused, saying "If [Mr. Aguirre] didn't like it that [he] could just [leave]." Mr. Felix told Mr. Aguirre and salesmen, Oscar Martinez and Jimmy Pagan, who were also present, that the sales staff was always on a break.

At the following sales staff meeting held at the Respondent's facility, a salesperson other than Mr. Aguirre asked how much employees would be paid. Mr. MacGrew answered that if the sales staff did their jobs right, did the test rides, filled out the proper paperwork, followed the procedures, and did not give the car away for free, they would make money.[6]

At some point prior to receiving his first paycheck, Mr. Aguirre sold a 1999 Suburban that had been on the Respondent's lot for several months. According to Mr. Aguirre, a vehicle of the same description was listed on the Flat List with a commission rate of $1,000 to $2,000. When Mr. Aguirre received his paycheck, he was surprised that the amount was only $150 gross. Mr. Aguirre showed his paycheck to several fellow salespersons who agreed with him that the amount was unfair. When Mr. Aguirre confronted Mr. Felix about his small paycheck, pointing out he had sold the 1999 Suburban, Mr. Felix said the company had given the vehicle away almost for free.

Over the weeks of his employment, Mr. Aguirre talked to other sales employees about his concerns with the way the Respondent paid them, the lack of a restroom facility at the Sears tent sales, and the inability to leave the work area by car to eat.

At one of the Respondent's Wednesday sales meetings, date unspecified, Mr. Plaza raised the following concerns: (1) scratches on the left rear panel of a vehicle for sale and (2) employee negativity. As to the first issue, Mr. Plaza said if the employee responsible for the damage to the vehicle did not come forward, he would deduct the repair cost from sales employees' paychecks. Mr. Aguirre objected, saying, "I believe that is unfair for you to do that to us. We work hard for our money . . . if you're going to deduct any kind of money from anyone's payroll, it would be fair to deduct from everyone who has access to this vehicle." As to the issue of employee negativity, Mr. Plaza said Respondent had a stack of applications from hopeful job seekers whom they could easily hire.[7] Mr. Plaza asked employees to speak about employee morale. Salesman Oscar Martinez told Mr. Plaza the only problem he had was with the breaks and meal periods and that Mr. Felix, in addressing those issues, was short with him and disrespectful. Mr. Plaza answered that the company was trying to work out the meal and break issue and that he would talk to Mr. Felix.

In October at a Sears tent sale, Mr. Aguirre told Mr. Felix, essentially, that he wanted to know which cars would deliver good commissions upon sale because he thought the company was stealing his money. Mr. Felix told Mr. Aguirre that if he didn't trust the company or their method of payment, he was welcome to go elsewhere.[8]

_____

[4] Sometime in 2009 after being contacted by the Industrial Commission of Arizona with regard to minimum wage violations, the Respondent began compensating its salespeople with a minimum wage as a draw against commissions.

[5] Consequent to the Respondent's rental of the Sears parking lot, the Respondent's employees were permitted to use the mall's restrooms.

[6] The Respondent encouraged salespeople to fill out all proper documentation for the sale, including customer references, identification, insurance, etc., to urge the customer to pay the purchase price rather than pressuring the "desk" to lower the price, to avoid offering up to $500 cash-back incentives on select vehicles, and to take potential

buyers on test rides. At some unspecified time, Mr. Felix had told Mr. Aguirre that if he did not offer incentives, he could make good money.

[7] Mr. Plaza denied telling Mr. Aguirre at this meeting that if he did not like company procedures, he didn't have to work there or could leave. Mr. Plaza did not deny referring to multiple employment applicants, and I find that employees could reasonably infer from his statements that they could seek other employment if they were dissatisfied. Counsel for the General Counsel sought permission to amend the complaint to allege Mr. Plaza's statement as a violation of Sec. 8(a)(1), which I denied. While not addressed herein as a violation, the exchange between Mr. Aguirre and Mr. Plaza is relevant to animus.

[8] Mr. Felix denied this statement, saying he told Mr. Aguirre that "nobody should be in a company if they don't believe in the company." However, in his Board affidavit, Mr. Felix recounted, "I told [Mr. Aguirre] that if he did not trust the company, that he should not work for the company," and in redirect examination, did not challenge the underlying fact assumption in Respondent counsel's question,

500                                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

In late October, Mr. Aguirre contacted an Arizona agency with jurisdiction over wage and hour issues[9] about the Respondent's sales compensation system. Thereafter, Mr. Aguirre told fellow salespersons that the Labor Commission had said the employees should get minimum wages as a draw against commissions. Mr. Aguirre told the others that when he got the full facts from the Labor Commission he would inform Ms. Montenegro of his findings.[10]

On October 28, Mr. Aguirre approached Ms. Montenegro in her office and asked her if the salespeople were entitled to minimum wage as a safety net toward future commissions. Ms. Montenegro said the company did not pay minimum wage and if Mr. Aguirre wanted a minimum wage job, the sales job was not the job for him. Mr. Aguirre told Ms. Montenegro he had spoken to the Arizona Labor Board and that the salespeople were entitled to minimum-wage compensation. He asked Ms. Montenegro if she could find the answer to his minimum pay question, suggesting she ask Mr. Plaza.

Later that afternoon, Mr. Felix called Mr. Aguirre to his office for a meeting with Mr. Plaza (the October 28 meeting). Just prior to the meeting, Mr. Felix told Mr. Plaza that Mr. Aguirre complained about everything all the time, e.g., about not trusting the company's calculation of commissions and not knowing the vehicle cost. Mr. Plaza, Mr. Felix, and Mr. MacGrew were present for the Respondent at the meeting. All four participants testified to what occurred there. Because the sequence, as well as the substance, of statements made in the meeting is critical to final determinations herein, a summary of each account follows:

Mr. Aguirre's account: Mr. Aguirre initially testified that Mr. Plaza said, "Nick, you know, you're asking too many questions . . . we're giving you an opportunity to work here and you're just asking all these questions about everything . . . about the price of the vehicles, you're asking too much information.[11] You're asking about the minimum wage. You are not following policy and procedures. . . You're being negative towards the pay . . . you don't meet our criteria. You're fired." Under further examination, Mr. Aguirre expanded the scope of the conversation: Mr. Plaza said the cost of vehicles

was for his eyes and his eyes only and that if Mr. Aguirre did not like it, he was more than welcome to leave or to quit. Mr. Plaza said the company paid the salespeople very well and asked why Mr. Aguirre did not complain when he received a check for seven or eight hundred dollars to which Mr. Aguirre expressed concern about payment accuracy. Mr. Aguirre protested Mr. Plaza's charge that he did not meet the company's criteria, saying he took care of the customers with respect, did what he was told, moved cars back and forth, did everything he could, and did the proper paperwork. Mr. Aguirre told Mr. Plaza he believed Mr. Plaza was upset because he called the Labor Board.

Only after Mr. Plaza told Mr. Aguirre he was fired, did Mr. Aguirre respond intemperately, saying "How can you do this to somebody, especially somebody that works hard that just had a baby[12] . . . this is what I get for trying to succeed." Mr. Aguirre told Mr. Plaza he was an "F'ing mother F'ing," an "F'ing crook, and an a—hole." He asked how Mr. Plaza could fire him just for calling the Labor Board.

Mr. Aguirre asked for his pay since he was being fired. When Mr. Plaza told him he had up to three days to provide the final check, Mr. Aguirre said, "You'll get what's coming to you if I don't get my check."[13]

Mr. Plaza's account: Mr. Plaza met with Mr. Aguirre because he understood from Ms. Montenegro that Mr. Aguirre had raised minimum wage concerns with her and had requested a meeting. Mr. Plaza had no intention of discharging Mr. Aguirre.

At the inception of the meeting, Mr. Plaza asked Mr. Aguirre what was going on, stating that he was concerned because Mr. Aguirre was "talking a lot of negative stuff" that would have a negative impact on the sales force. Mr. Aguirre said he had questions about vehicle costs, sales commissions, and minimum wage. Mr. Plaza told Mr. Aguirre he needed to follow company policies and procedures, referring to the company's pay structure, about which he thought Mr. Aguirre should not be complaining.[14] Mr. Plaza told Mr. Aguirre it was a normal practice in the car business for employees not to know the cost of vehicles. Mr. Plaza twice told Mr. Aguirre that if he did not trust the company, he did not need to work there. Mr. Aguirre became upset, arose from his chair, and said that Mr. Plaza was a f— a—hole, that nobody liked him, that he was f— stupid, that he did not know what he was doing, that he did not know everyone was talking about him, and that he thought he could fire anybody he wanted to. Mr. Plaza believed Mr. Aguirre would have physically attacked him if the others had not been there. Mr. Plaza asked Mr. Aguirre to

---

"[W]hy did you make the comment to Aguirre that, if he didn't trust the company, that he should not work for the company?" I accept Mr. Aguirre's account of the statement.

[9] The parties did not identify the agency's official title. In its posthearing brief, the General Counsel states the correct title is "Industrial Commission of Arizona." References to the Labor Commission or Arizona Labor Board are to the Arizona agency covering wage and hour issues.

[10] Salesman James Pagan testified, essentially, that Mr. Aguirre told other employees he was looking into the minimum wage question and that he was going to speak to the Arizona Labor Board. Mr. Pagan denied that Mr. Aguirre spoke for him, saying, "If I had a problem with my workplace, I could take care of it myself."

[11] Mr. Plaza did not specifically deny that he accused Mr. Aguirre of asking too many questions, and his testimony that he told Mr. Aguirre he was "talking a lot of negative stuff" that would have a negative impact on the sales force sends an equivalent message, i.e., that Mr. Aguirre was improperly questioning company practices. I credit Mr. Aguirre's testimony in this regard.

[12] Mr. Aguirre's second child was born October 11. His first child had just turned two, and Mr. Aguirre was the sole support of his family.

[13] Mr. Aguirre testified that he only meant he would call the proper authorities or organizations to help him get any money due him, but Mr. Aguirre did not in any way qualify his warning that Mr. Plaza would get what was coming to him, and I conclude his statement was menacing.

[14] According to Mr. Plaza, Mr. Aguirre was at that time making more than minimum wage.

APPENDIX 056

"calm down, settle down, to quit saying what he was saying." When Mr. Aguirre did not comply, and after Mr. Aguirre called him a f— a—hole for the "tenth time," Mr. Plaza told him, "you're done, Nick." Mr. Aguirre asked, "You're going to f— fire me for calling the Labor Department?" Mr. Plaza answered, "No, Nick. I'm firing you because you abused me verbally, almost physically."

On October 28, following Mr. Aguirre's discharge, Mr. Plaza wrote the following memo:

> October 28, 2008
> (Tuesday) I had a meeting with my managers, Juan & Gustavo with salesman Nick Aguirre. He had asked to meet with me as soon as I came in and I also had concerns about his attitude and negative influence to the rest of my employees. He was always talking negative about work procedures and everything in general. I also went over that if he could not follow policy and procedures according to our policy manual, then he did not need to work here. I also told him we would not let him know our investment in each of the vehicles and again told him he did not have to work here. At this point he got really upset and every sentence out of his mouth included the "F" word. I asked him to calm down but he was out of control and after several uses of the "F" word I terminated him immediately. We will not tolerate verbal abuse and in conclusion will never rehire or refer Nick to anyone who calls for references.

Mr. Felix's account:[15]  Mr. Plaza told Mr. Aguirre they were meeting because Mr. Felix and Ms. Montenegro had told him Mr. Aguirre wanted to speak to him about concerns Mr. Aguirre had. Mr. Plaza told Mr. Aguirre the Respondent had rules and policies like every other company, and if an employee was not happy with the rules, they did not need to work there. Mr. Aguirre said he had been doing everything he had been asked to do. Mr. Aguirre told Mr. Plaza why he wanted to know the cost of the vehicles, and Mr. Plaza said, "I am just telling you that, if you are not happy here, you don't have to work here." At some point, Mr. Aguirre asked if he were going to be fired, a question he repeated six or seven times during the meeting and to which Mr. Plaza invariably answered, "No."[16]

During the course of the meeting, Mr. Aguirre called Mr. Plaza f— stupid and said that if he got fired, Mr. Plaza was

going to regret it.[17]  He said Mr. Plaza was f— stupid because he didn't even know what people were saying about him outside the building. As he was "cussing" Mr. Plaza, Mr. Aguirre stood up, "threw his chair," and faced Mr. Plaza. Believing Mr. Aguirre was going to hit Mr. Plaza, Mr. Felix stood also, as did Mr. MacGrew. Mr. Plaza said, "You know what, that's it, I don't have to get all this from you." Mr. Plaza then told Mr. Aguirre he was done; he was fired. Mr. Felix and Mr. MacGrew "invited" Mr. Aguirre to leave Mr. Felix's office.

Mr. MacGrew's account:[18]  At the beginning of the meeting, Mr. Plaza told Mr. Aguirre that whether or not he liked working at the company, he needed to follow the company's procedures and policies. Mr. Plaza told Mr. Aguirre that if he did not trust the company, he did not have to work there. Immediately Mr. Aguirre began telling Mr. Plaza he was stupid, did not know people were talking about him behind his back, was an a—hole, and f— Mr. Plaza. In the course of the meeting, Mr. Aguirre repeatedly asked if Mr. Plaza was going to fire him. Toward the end of the meeting, Mr. Aguirre stood up, and Mr. Felix and Mr. MacGrew told him that was enough and that it was time to go. Mr. Plaza also stood and said, "You know, I don't need to hear this; you're done."

Mr. Felix occasionally used obscene language, including the "F" word, when directing employees, but Mr. Aguirre had never heard him do so in Mr. Plaza's presence. In 2008 the Respondent fired salesman, Eddie Yemes, because he was "abusive with foul language" to Mr. Felix while working at a tent sales event when he told Mr. Felix to f— himself.

### V. DISCUSSION

#### A. Underlying Legal Principles

Section 7 of the National Labor Relations Act provides that employees have the right to engage in union activities and, in pertinent part, "the right to . . . engage in . . . concerted activities for the purpose of collective bargaining or other mutual aid or protection." The protection afforded by Section 7 extends to employee efforts to improve terms and conditions of employment or otherwise improve their lot as employees. Section 8(a)(1) of the Act provides: "It shall be an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7."

To enjoy Section 7 safeguards, employee activity must be both "concerted" and "protected," which a propounding party may prove by showing the activity (1) involves a work-related complaint or grievance; (2) furthers some group interest; (3) seeks a specific remedy or result; and (4) is not unlawful or otherwise improper. *NLRB v. Robertson Industries*, 560 F.2d 396, 398 (9th Cir. 1976), cited with approval by the Board in *Northeast Beverage Corp.*, 349 NLRB 1166 fn. 9 (2007). To

---

[15]  Mr. Felix described the meeting both on direct and cross-examination. His two accounts vary in certain details and order but are otherwise consistent.

[16]  Counsel for the General Counsel argues that Mr. Felix's testimony regarding the number of times Mr. Aguirre asked if he were going to be fired was so hyperbolic that it destroyed Mr. Felix's credibility. While it seems unlikely Mr. Aguirre made the inquiry as often as Mr. Felix estimated, the apparent exaggeration does not destroy Mr. Felix's credibility, and I credit Mr. Felix's testimony that Mr. Plaza denied any intent to fire Mr. Aguirre.

[17]  As noted earlier, Mr. Aguirre admitted to a similar statement (that Mr. Plaza would "get what's coming to" him) but placed the threat after the discharge and in connection with a question about his final paycheck.

[18]  Mr. MacGrew's account, as set forth herein, is an amalgamation of his direct and cross-examination testimony.

502 DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

be concerted, employee activity must be engaged in with or on the authority of other employees, and not solely by and on behalf of the employee himself. *Meyers Industries,* 268 NLRB 882 (1986). Concerted activity includes individual activity that seeks to initiate or to induce or to prepare for group action, as well as individual employees bringing group complaints to the attention of management. *Meyers Industries,* 281 NLRB 882 (1986). Employees do not have to accept the individual's call for group action before the invitation itself is considered concerted. *Cibao Meat Products,* 338 NLRB 934 (2003); *Whittaker Corp.,* 289 NLRB 933, 934 (1988); *El Gran Combo,* 284 NLRB 1115 (1987). "[C]oncertedness . . . can be established even though the individual [speaking] was not 'specifically authorized'. . . to act as a group spokesperson for group complaints." *Herbert F. Darling, Inc.,* 287 NLRB 1356, 1360 (1988). Concerted activity includes concerns that are a "logical outgrowth" of group concerns. *Salisbury Hotel,* 283 NLRB 685, 687 (1987); *Compuware Corporation,* 320 NLRB 101 (1995). Work-related complaints or grievances include terms and conditions of employment[19] and concerted complaints to governmental agencies.[20]

In cases turning on employer motivation, the Board applies an analytical framework that assigns the General Counsel the initial burden of showing protected concerted activity was a motivating or substantial factor in an adverse employment action. The elements commonly required to support such a showing are protected activity by the employee, employer knowledge of that activity, and animus on the part of the employer. The burden then shifts to the employer to prove, as an affirmative defense, that it would have taken the same action even in the absence of the employee's protected activity. *Wright Line,* 251 NLRB 1083, 1089 (1980), enfd. 662 F.2d 899 (1st Cir. 1981), cert. denied 455 U.S. 989 (1982); *Alton H. Piester, LLC,* 353 NLRB 369 (2008).

Even when an employee is engaged in protected activity, he or she may lose the protection of the Act by egregious behavior, including displaying "an opprobrious or abusive manner." *Verizon Wireless,* 349 NLRB 640, 646 (2007). In assessing employee behavior asserted to be egregious, the Board considers four factors: (1) the place of the discussion; (2) the subject matter of the discussion; (3) the nature of the employee's outburst; and (4) whether the outburst was, in any way, provoked by the employer's unfair labor practices. *Atlantic Steel,* 245 NLRB 814, 816 (1979).[21]

### B. Mr. Aguirre's Concerted Protected Activities

1. Mr. Aguirre's concerns about breaks and restroom facilities

Mr. Aguirre's first day of employment coincided with a Sears tent sale, where Mr. Aguirre discussed availability of restroom facilities with fellow salespeople. A few days later, during a sales staff meeting with management, Mr. Aguirre

asked about employee entitlement to breaks and meal periods during the Sears tent sales. In this concern, Mr. Aguirre was joined by another salesman who, at a later sales meeting, expressed dissatisfaction with the Respondent's breaks and meals arrangements. Mr. Aguirre continued to raise this and related concerns with other employees in the ensuing weeks: discussing alternating restroom breaks, talking about the lack of a restroom facility at the Sears tent sales, and complaining about the inability to leave the work area by car for meals.

Employee breaks and availability of restroom facilities are employment terms and conditions of general application to employees. Mr. Aguirre raised those issues with management during a sales meeting, as did another employee in a later meeting. From those circumstances, as well as Mr. Aguirre's ongoing related discussions with fellow sales personnel, it is clear that Mr. Aguirre's complaints about breaks and restroom facilities were both protected and concerted. *Hahner, Foreman & Harness, Inc.,* 343 NLRB 1423 (2004) (complaint about paycheck not compensating for lost benefits to management in the presence of coworkers); *Cibao Meat Products,* at 934 ("activity of a single employee in enlisting the support of his fellow employees for their mutual aid and protection is as much 'concerted activity' as is ordinary group activity." Such individual action is concerted as long as it is "engaged in with the object of initiating or inducing . . . group action." Citations omitted.) *NLRB v. Caval Tool Division,* 262 F.3d 184, 190 (2d Cir. 2001) (enforcing Board order finding employee complaint about working conditions made in group meeting was protected concerted conduct on behalf of the group); *Phillips Petroleum Company,* 339 NLRB 916 (2003); *Avery Leasing,* 315 NLRB 576, 580 fn. 5 (1994) (finding concerted activity where an employee, in the presence of other employees, complained to management concerning wages, hours, or other terms and conditions of employment).

Mr. Aguirre's actions with regard to employee breaks and restroom facilities, as described herein, constituted concerted protected activity.

2. Mr. Aguirre's concerns about sales compensation

Early in his employment, Mr. Aguirre took issue with the Respondent's commission-only compensation of sales personnel and its calculation of commissions. Expression of his concern included talking with other salespeople about the Respondent's compensation system, asking Mr. Felix for information as to which vehicles were likely to produce good commissions, showing his unexpectedly low first commission to other employees who agreed the amount was unfair, asking management about the basis of the commission, discussing with fellow salespeople his plan to contact an Arizona state agency about the Respondent's commission-only policy, contacting the agency, thereafter sharing the information learned with fellow employee, telling fellow employees he would inform management, and thereafter sharing his findings with Ms. Montenegro.

Wages are clearly an employment term of prominent interest to employees and employee attention to wages is protected. Although fellow salesman, James Pagan, denied that Mr. Aguirre spoke for him in pursuing his wage inquiries, it is clear Mr. Aguirre attempted to engage the interest of other sales em-

---

[19] *Valley Hospital Medical Center,* 351 NLRB 1250, 1252 (2007).

[20] *Delta Health Center, Inc.,* 310 NLRB 26 (1993).

[21] Evidence of employer knowledge that activity is protected is not a necessary element under *Alliance Steel Products.* The test is whether employer conduct would interfere with, restrain, or coerce employees in the exercise of their Sec. 7 rights. *Alliance Steel Products* at 495.

ployees, including Mr. Pagan, in his wage inquiries by discussing with them perceived wage inequities, by telling them of his state agency information quest, and by alerting them to his intended confrontation with management. It is equally clear that the wage issues Mr. Aguirre addressed affected all sales employees and that the resolutions Mr. Aguirre sought would impact all sales employees. In these circumstances, Mr. Aguirre's involvement with wage issues was concerted. See *Meyers Industries*, 281 NLRB 882 (1986) (individual employees bringing group concerns to the attention of management); *Cibao Meat Products,* supra (concerted action does not depend on employee acceptance of individual's call for group involvement); *Salisbury Hotel*, supra (concertedness includes concerns that are a "logical outgrowth" of group concerns); *Compuware Corp.*, supra (individual employee complaint to State labor board, although unauthorized by group, was a continuation of group efforts); *JMC Transport*, 272 NLRB 545, 546 fn. 2 (1984), enfd. 776 F.2d 612 (6th Cir. 1985) (complaint about discrepancy in individual paycheck was a continuation of employees' protected concerted activity in protesting, a month earlier, the company's change in the way employee wage payments were calculated).

Mr. Aguirre's actions with regard to sales employee compensation, as described herein, constituted concerted protected activity.

### C. Alleged Threats of Reprisal and Invitations to Quit Employment

The Complaint alleges that the Respondent violated Section 8(a)(1) of the Act when the following supervisors on the following dates threatened employees by inviting them to quit their employment:

| | | |
|---|---|---|
| Mr. Felix | — | September 3 and October |
| Ms. Montenegro | — | October 28 |
| Mr. Plaza | — | October 28 |

At a late August/early September sales staff meeting, when Mr. Aguirre asked about employee breaks during Sears tent sales, Mr. Felix told him that if he did not like the way the company operated, he was welcome to leave at any time. At a Sears tent sale in mid-September, Mr. Aguirre discussed with other employees how to alternate restroom use. In the presence of two other salesmen, Mr. Aguirre asked Mr. Felix for permission to take a meal break and use the restroom. Telling all three salesmen that the sales staff was always on a break, Mr. Felix refused Mr. Aguirre's request, saying that if Mr. Aguirre did not like it, he could just leave.[22] At another Sears tent sale held sometime in October, when Mr. Aguirre asked Mr. Felix to identify cars whose sale would deliver good commissions, Mr. Felix replied that employees who do not trust in the company should leave its employ.

On October 28, when Mr. Aguirre, after conferring with fellow employees, asked Ms. Montenegro about the sales staff's entitlement to a minimum wage draw against commissions, Ms. Montenegro told him that if he wanted a minimum wage job,

the sales job was not the job for him. Later that same day, during the course of his meeting with Mr. Aguirre, Mr. Plaza told Mr. Aguirre that if he did not like the company's refusal to divulge vehicle costs, he was more than welcome to leave or to quit, and Mr. Plaza twice told Mr. Aguirre that if he did not trust the company, he did not need to work there.

An employer that responds to protected concerted protests of working conditions by telling employees they can leave if they do not like the conditions coerces employees within the meaning of Section 8(a)(1) of the Act. Inviting employees to quit their employment in such circumstances interferes with the free exercise of employees' Section 7 right to protest working conditions. *Alton H. Piester, LLC*, 353 NLRB 369 (2008); *House Calls, Inc.*, 304 NLRB 311, 313 (1991); *Chinese Daily News*, 346 NLRB 906 (2006); *McDaniel Ford, Inc.*, 322 NLRB 956 fn. 1 (1997) ("It is well settled that an employer's invitation to an employee to quit in response to their exercise of protected concerted activity is coercive, because it conveys to employees that . . . engaging in . . . concerted activities and their continued employment are not compatible, and implicitly threatens discharge of the employees involved.")

Mr. Felix, Ms. Montenegro, and Mr. Plaza's suggestions to Mr. Aguirre that he cease working for the Respondent if he did not like its terms and conditions of employment were made in response to his protected concerted activities described above. As such, the suggestions were coercive. Accordingly, the Respondent's conduct in this regard violated Section 8(a)(1) of the Act as alleged in the complaint.

The complaint further alleges the Respondent violated Section 8(a)(1) of the Act when Mr. Plaza threatened employees with unspecified reprisals. The basis for the allegation is Mr. Plaza's statement to Mr. Aguirre in the October 28 meeting that he was "asking too many questions [about company policies]." The General Counsel argues this statement alone impliedly threatened reprisals if Mr. Aguirre persisted in the protected activity of questioning company practices. While Mr. Plaza expressed displeasure with Mr. Aguirre's protected inquiries and thereby evidenced animus toward those activities, it is too great a stretch to categorize the statement as a threat. Accordingly, I will dismiss that allegation of the complaint.

### D. Discharge of Nick Aguirre

The General Counsel argues that the only reason the Respondent discharged Mr. Aguirre was because of the negative influence Mr. Plaza believed Mr. Aguirre's protected activities had on other employees. The Respondent argues that the only reason the Respondent terminated Mr. Aguirre was his physically intimidating and abusive behavior in the October 28 meeting. Determining the Respondent's motivation requires a *Wright Line* analysis. If the Respondent's argument is accepted, determining whether Mr. Aguirre's behavior at the October 28 meeting justified his discharge requires an *Atlantic Steel* analysis.[23]

Many of the facts surrounding Mr. Aguirre's discharge are not disputed: On October 28, Mr. Aguirre told Ms. Montenegro

---

[22] Although the record shows this exchange to have occurred in mid-September, it fits within the time parameters of complaint allegation 4(c) that such a threat was made "in or about October 2008."

[23] See *Alton H. Piester*, supra; *Waste Management of Arizona, Inc.*, 345 NLRB 1339 (2005).

504     DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

he had learned from an Arizona State agency that the Respondent was improperly withholding minimum wage compensation from its commissioned salespeople. Ms. Montenegro thereafter arranged the October 28 meeting. Just prior to the meeting, Mr. Felix told Mr. Plaza that Mr. Aguirre complained about everything all the time, e.g., about not trusting the company's calculation of commissions and not knowing the vehicle cost. At the meeting, Mr. Plaza criticized Mr. Aguirre's negative attitude toward company policies and procedures. Mr. Plaza told Mr. Aguirre that if he did not trust the company, he did not need to work there. During the course of the meeting, Mr. Aguirre became upset and, according to the various accounts, told Mr. Plaza that he was a "F'ing mother F'ing," a "F'ing crook," and an a—hole, that he was stupid, that nobody liked him, and that everyone was talking about him behind his back. At some point in the meeting, Mr. Plaza fired Mr. Aguirre.

There remain two critical factual disputes as to what happened at the October 28 meeting: (1) At what point in the meeting did Mr. Plaza fire Mr. Aguirre? (2) What were the circumstances and manner of Mr. Aguirre's outburst? The General Counsel's position is that Mr. Plaza fired Mr. Aguirre before Mr. Aguirre verbally assailed Mr. Plaza and that, given the Respondent's unlawful conduct, Mr. Aguirre engaged in no unjustifiable behavior. The Respondent's position, on the other hand, is that Mr. Aguirre's threatening and volatile verbal attack both preceded and was the direct cause of Mr. Aguirre's discharge.

I have carefully considered the testimonies of all witnesses to the October 28 meeting. In doing so, I have taken into account the witnesses' manner and demeanor while testifying, as well as the circumstances surrounding the discharge. I give greater weight to the testimonies of Mr. Plaza, Mr. Felix, and Mr. MacGrew. While discrepancies exist in each of their accounts, I found the three management witnesses demonstrated efforts to convey honest, unbiased recollections of the meeting. Mr. Aguirre's testimony was not as believable. Mr. Aguirre initially testified that at the October 28 meeting, Mr. Plaza bluntly itemized his displeasure with Mr. Aguirre's activities and abruptly fired him. Under further questioning, Mr. Aguirre significantly expanded his account of what occurred at the meeting, including Mr. Plaza's statement that if Mr. Aguirre did not like being kept in ignorance of vehicle cost, he was more than welcome to leave or to quit. Not only was Mr. Aguirre's initial testimony not fully congruous with his expanded version of the meeting, Mr. Plaza's implicit invitation to Mr. Aguirre to accept company policy or quit is incompatible with Mr. Aguirre's earlier testimony of abrupt discharge. Accordingly, I do not credit Mr. Aguirre's account of the October 28 meeting where it conflicts with the accounts of Mr. Plaza, Mr. Felix, and Mr. MacGrew.

Mr. Plaza testified he had no intention of firing Mr. Aguirre when he began the October 28 meeting and, until the conclusion of the meeting, told Mr. Aguirre he was not being fired. Consistent with the credibility assessments herein, I accept Mr. Plaza's testimony. Mr. Plaza, Mr. Felix, and Mr. MacGrew, whose testimonies I have credited, were consistent in placing Mr. Aguirre's verbal outburst before Mr. Plaza announced his discharge. Therefore, I find that Mr. Aguirre's denouncement of Mr. Plaza preceded Mr. Aguirre's discharge. I further find that Mr.

Aguirre's behavior in cursing and derogating Mr. Plaza was at least physically aggressive if not menacing.[24]

A finding that Mr. Aguirre verbally attacked Mr. Plaza before rather than after Mr. Plaza fired him on October 28, does not, of course, automatically resolve the issue of why the Respondent fired Mr. Aguirre. The question remains whether the Respondent fired Mr. Aguirre solely because he engaged in concerted protected activities, as counsel for the General Counsel contends, or whether, as the Respondent contends, the Respondent fired Mr. Aguirre because he insulted Mr. Plaza. Since the existence of an arguably valid reason for discharge cannot, in and of itself, expunge an unlawful reason, the Respondent's motivation must be determined by application of a *Wright Line* analysis.

The General Counsel has proven the elements required by *Wright Line*: the General Counsel has shown that Mr. Aguirre engaged in concerted protected activity, that the Respondent's managers knew of the activity, and that the Respondent bore animus toward the activity, as demonstrated by management's repeated suggestions that unhappy employees seek employment elsewhere. The General Counsel having met his initial burden, the burden of proof shifts to the Respondent to prove it would have fired Mr. Aguirre even in the absence of his protected activity.

The Respondent contends that irrespective of Mr. Aguirre's protected activity, Mr. Plaza would have fired him for his profane personal attack at the October 28 meeting. There is no question that Mr. Aguirre's behavior could reasonably be expected to provoke discharge. However, "[a]n employer cannot simply present a legitimate reason for its action but must persuade by a preponderance of the evidence that the same action would have taken place even in the absence of the protected activity." *Yellow Ambulance Service*, 342 NLRB 804, 804 (2004), citations omitted. In 2008, Mr. Plaza directed Mr. Felix to fire salesman Eddie Yemes because he told Mr. Felix to f— himself. Considering that Mr. Aguirre's October 28 contumely was directed at Mr. Plaza himself and was more extensive and opprobrious than Eddie Yemes' outburst, it is reasonable to conclude that the Respondent would have fired Mr. Aguirre for his verbal attack on Mr. Plaza regardless of the Respondent's animosity toward Mr. Aguirre's protected activity. Accordingly, I find the Respondent has met its shifted burden under *Wright Line* and has shown that it fired Mr. Aguirre because he verbally abused Mr. Plaza.

A finding that the Respondent fired Mr. Aguirre because of his October 28 outburst does not lay the discharge issue to rest. The purpose of the October 28 meeting was to address Mr. Aguirre's complaints about the Respondent's sales compensation practices. Mr. Aguirre's participation in the meeting was a furtherance of his concerted, protected wage complaints. At the meeting, Mr. Aguirre engaged in behavior the Respondent contends was opprobrious. "An employer violates the Act by discharging an employee engaged in the protected concerted activ-

---

[24] In finding Mr. Aguirre's behavior to be belligerent, I rely on credited testimony that in the course of his outburst and prior to the discharge, Mr. Aguirre rose from his chair, pushed it aside and said that if he was fired, Mr. Plaza would regret it. As noted earlier, Mr. Aguirre admitted to menacing language—"You'll get what's coming to you"—although in a different context.

ity of voicing a complaint about his employment terms unless, in the course of that protest, the employee engages in opprobrious conduct, costing him the Act's protection." *Alton H. Piester, LLC,* supra at 374. Although I have found that the Respondent fired Mr. Aguirre because of his contumacious behavior in the October 28 meeting, it must yet be determined whether Mr. Aguirre's behavior was so egregious as to lose the Act's protection. See *Verizon Wireless,* 349 NLRB 640, 646 (2007).

In assessing employee behavior asserted to be egregious, the four factors enunciated in *Atlantic Steel*[25] must be considered: (1) the place of the discussion; (2) the subject matter of the discussion; (3) the nature of the employee's outburst; and (4) whether the outburst was, in any way, provoked by the employer's unfair labor practices.

Considering the first factor, Mr. Aguirre's outburst occurred in the presence of management only, and there is no evidence any unit employee overheard the confrontation. The outburst, therefore, had no impact on workplace discipline, nor did Mr. Aguirre's offensive behavior undermine management authority. The place of the discussion, thus isolated from other workers, argues against loss of protection.[26] As to the second and fourth factors, the discussion related wholly to Mr. Aguirre's protected concerted activity. Further, Mr. Aguirre's outburst was contemporaneous with both the Respondent's censure of Mr. Aguirre's protected activity as "a lot of negative stuff" that negatively impacted the sales force and the Respondent's coercive conduct in pointing out that Mr. Aguirre did not have to work for the Respondent if he did not like or trust the company. Both statements are provocative, and the latter, as detailed above, is an unfair labor practice. The subject matter of the discussion, intertwined as it was with the Respondent's intrinsically provocative unfair labor practices, also militates against loss of protection.[27] Accordingly, the first, second, and fourth *Atlantic Steel* factors weigh in favor of protection.

The third factor, the nature of Mr. Aguirre's outburst, is not so easily resolved. Board law establishes that "employees are permitted some leeway for impulsive behavior when engaging in concerted activity, subject to the employer's right to maintain order and respect [citation omitted]." *Tampa Tribune,* 351 NLRB 1324, 1324–1325 (2007), enf. Denied sub nom. *Media General Operations, Inc. v. NLRB,* 560 F. 3d 181 (4th Cir. 2009).[28] The

standard for determining whether specified conduct is removed from the protection of the Act is whether the conduct is "so violent or of such serious character as to render the employee unfit for further service." *St. Margaret Merry Healthcare Centers,* 350 NLRB 203, 204–205 (2007); *Dreis Rump Mfg. v. NLRB,* 544 F.2d 320, 324, (7th Cir. 1976). Insulting profanity alone is not as egregious as to justify loss of the Act's protection.[29] However, repeated use of profanity in a loud ad hominem attack on a supervisor may lose the Act's protection. *Daimler Chrysler Corp.,* 344 NLRB 1324, 1329–1330 (2005).

The question is whether, in the instant circumstances, Mr. Aguirre retained the Act's protection in spite of his outburst or lost the Act's protection because of his outburst. In *Daimler Chrysler Corp.,* supra, the behavior that cost an employee the Act's protection was the making of repeated, extensive, and personally derogatory statements to a supervisor, behavior similar to Mr. Aguirre's. However, *Daimler* differs from the instant situation in that only one *Atlantic Steel* factor—subject matter—favored protection, while here three of the four *Atlantic Steel* factors favor protection with only the nature of Mr. Aguirre's outburst weighing against protection.

Notwithstanding the fact that only one *Atlantic* steel factor disfavors Mr. Aguirre's protection in this case, the impact of that sole factor must not be minimized. It is clear the Board carefully considers the form and scope of offensive language in opprobrious behavior cases.[30] Upon court remand of *Felix Industries*[31], the Board considered the question of whether the nature of an employee's outburst (factor three), by itself, may outweigh the other *Atlantic Steel* factors. The Board stated that "the nature of [an employee's] outburst must be given considerable weight towards losing the Act's protection." *Felix Industries,* 339 NLRB 195, 196 (2003). While the Board in *Felix Industries* decided that the other factors outweighed factor three in that case, the

---

[25] *Atlantic Steel,* supra at 816.

[26] Remarks made in private are less disruptive to workplace discipline than those made in the presence of fellow employees. *Stanford Hotel,* 344 NLRB 558 (2005); *Noble Metal Processing,* 346 NLRB 795, 800 (2006) (place of discussion weighs in favor of protection where outburst occurred away from employees' work area and did not disrupt the work process).

[27] *Care Initiatives,* 321 NLRB at 152 ("[A]n employer may not rely on employee conduct that it has unlawfully provoked as a basis for disciplining an employee [citation omitted]"); *Datwyler Rubber & Plastics,* 350 NLRB 669, 669–670 (2007) (employee did not lose protection of the Act by calling supervisor a devil whom Jesus Christ would punish for requiring a 7-day work week); *Stanford Hotel,* supra (brief profanity protected where it was a response to unlawful threats).

[28] The protections of Sec. 7 would be meaningless were the Board not to take into account the realities of industrial life and the fact that disputes over wages, bonus, and working conditions are among the

---

disputes most likely to engender ill feelings and strong responses. *Consumers Power Co.,* 282 NLRB 131, 132 (1986).

[29] See *Alcoa Inc.,* 352 NLRB 1222 (2008), (referring to supervisor as "egoistical f—er"); *Tampa Tribune* supra, (calling supervisor a "stupid f—ing moron."); *Union Carbide Corp.,* 331 NLRB 356, 359 (2000) (calling supervisor a "f—ing liar"); *Burle Industries,* 300 NLRB 498, 502, 504 (1990) (calling supervisor a "f—ing a—hole"); *Thor Power Tool Co.,* 148 NLRB 1379, 1380 (1964), enfd. 351 F. 2d 584 (7th Cir. 1965), (referring to supervisor as a "horse's ass"); *Postal Service,* 241 NLRB 1074 (1979) (referring to acting supervisor as an "a—hole"); *NLRB v. Cement Transport Co.,* 490 F.2d 1024, 1030 (6th Cir. 1974) (referring to company president as a "son of a bitch").

[30] See, e.g., *Alcoa, Inc.,* at 1226 (employee/union steward's pejorative description of a supervisor as an "egotistical f—er" was "a single verbal outburst of profane language, in a disciplinary meeting . . . unaccompanied by physical contact or threat of physical harm," which did not destroy the Act's protection); *Beverly Health & Rehabilitation Services,* 346 NLRB 1319, 1323 (2006) (employee conduct "consisted of a brief, verbal outburst of profane language unaccompanied by insubordination, physical contact, or threat of physical harm); *Trus Joist Macmillan* 341 NLRB 369, 371–372 (2004) (employee's repetitious remarks that were personal and highly offensive cost him the protection of the Act); *Datwyler Rubber & Plastics, Inc.,* supra, (employee outburst protected, as it was spontaneous, brief, and unaccompanied by physical contact or threat of physical harm).

[31] *Felix Industries,* 331 NLRB 144, 146 (2000), enf. denied and remanded 251 F.3d 1051 (D.C. Cir. 2001).

506

DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

Board emphasized that the supervisor involved, who was also the son of the company's president, directed "extremely hostile" remarks to the employee, provoking his response that the supervisor was just a "f—ing kid" to whom the employee did not have to listen. Id. at 195, 196–197.

In applying the balancing test utilized by the Board in these kinds of cases, I have particularly noted the following circumstances: Mr. Aguirre's outburst was qualitatively and quantitatively more opprobrious than that considered in *Felix Industries*. Without extreme provocation from overt hostility or antagonism from Mr. Plaza, Mr. Aguirre repeatedly reviled Mr. Plaza in obscene and personally denigrating terms accompanied by menacing conduct and language. Considering these circumstances and the record as a whole, I find that Mr. Aguirre's behavior at the October 28 meeting was so egregious as to forfeit the protection of the Act. Accordingly, I find the Respondent did not violate the Act when it discharged Mr. Aguirre.

VI. CONCLUSIONS OF LAW

1. The Respondent is an employer engaged in commerce and in a business affecting commerce within the meaning of Section 2(6) and (7) of the Act.

2. The Respondent violated Section 8(a)(1) of the Act by telling employees they could quit or leave the Respondent's employ if they did not like company policies and/or procedures.

3. The unfair labor practices set forth above affect commerce within the meaning of Section 8(a)(3) and (1) and Section 2(6) and (7) of the Act.

REMEDY

Having found that Respondent has engaged in certain unfair labor practices, I find it must be ordered to cease and desist and to take certain affirmative action designed to effectuate the policies of the Act.

[Recommended Order omitted from publication.]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

RICARDO BRIONES            §

                          §

vs.                       §         Civil Action No. 1:17-CV-00029

                          §

FEDEX FREIGHT, INC.         §

### DEFENDANT'S OBJECTIONS, ANSWERS AND RESPONSES TO
### PLAINTIFF'S FIRST SET OF INTERROGATORIES AND REQUESTS FOR
### PRODUCTION

TO:    Ricardo Briones, Plaintiff, by and through his attorney of record:

     David C. Holmes
     Law Offices of David C. Holmes
     13201 Northwest Freeway, Ste. 800
     Houston, Texas  77040

     FedEx Freight, Inc., pursuant to Fed.R.Civ.P. 33 and 34, files this its Objections,

Answers and Responses to Plaintiff Ricardo Briones' First Set of Interrogatories and

Requests for Production.

                     Respectfully submitted,

                     By: /s/Rex Leach_____
                      Michael Rodriguez
                      Federal I.D. No. 18759
                      State Bar No. 00791553
                      50 W. Morrison Rd., Ste. A
                      Brownsville, Texas  78520-7262
                      Telephone: (956) 574-9333
                      Telecopier:(956) 574-9337
                      Email:  mrodriguez@atlashall.com
                      ATTORNEY IN CHARGE FOR
                      DEFENDANT

## OBJECTIONS AND ANSWERS TO
## PLAINTIFF'S FIRST SET OF INTERROGATORIES

**INTERROGATORY NO. 1:** Identify all persons who had authority to hire, fire, or supervise Mr. Briones at any time during her [sic] employment.

**ANSWER:**   Defendant objects to this interrogatory for the reason that same is overly onerous and burdensome in its reference to "all" and would therefore unreasonably restrict this Defendant's testimony and evidence herein.

Subject thereto and without waiving same: See the response to Interrogatory No. 2.

**INTERROGATORY NO. 2 (2-3):** Identify all persons who were involved in the decision to terminate Mr. Briones, and state the specific role of each person.

**ANSWER:**   Defendant objects to this interrogatory for the reason that same is overly onerous and burdensome in its reference to "all" and would therefore unreasonably restrict this Defendant's testimony and evidence herein.

Subject thereto and without waiving same:

1) Martha Coleman (Service Center manager): Took statements, reported Briones' conduct to Irene French and recommended termination.

2) Irene French (Employee Relations Advisor): Reviewed material sent by Coleman, interviewed the witnesses and prepared the Corrective Action Recap which included her own recommendation of termination

3) Rob Leach (Employee Relations Manager): Reviewed the Corrective Action Recap and supporting documents and approved the termination.

**INTERROGATORY NO. 3 (4):** State the reasons for Mr. Briones's termination.

**ANSWER:**   See the Personnel Change Request attached hereto as Ex. 1.

**INTERROGATORY NO. 4 (5-6):** With respect to paragraph 11 of your Answer:

(a)   Do you deny that you are a "person" for purposes of the STAA? If so, state the general factual basis for your denial.

(b)   Do you deny that Mr. Briones is an "employee" for purposes of the STAA? If so, state the general factual for your denial.

**ANSWER:**    (a) Do not deny.

               (b) Do not deny.

**INTERROGATORY NO. 5 (7-8):** With respect to Affirmative Defense 4:

    (a)    Identify the statutory damages caps that you contend to be applicable.

    (b)    State the general factual basis for your contention that Mr. Briones failed to mitigate his damages and identify the specific actions that you contend Mr. Briones should have taken.

**ANSWER:**    Defendant objects to this interrogatory in that it seeks the marshalling of evidence and seeks to limit this Defendant's testimony at trial. Defendant further objects to this interrogatory as invading the attorney-work product, and violating attorney-client, party communication, trial preparation and investigative privileges. Defendant further objects for the reason that same is overly broad and an impermissible fishing expedition.

               Subject thereto and without waiving same: Defendant would show that discovery is ongoing and will supplement with any specific evidence discovered. As to the statutory damages cap, there is a $250,000 statutory damages cap under the STAA.

**INTERROGATORY NO. 6 (9):** With respect to Affirmative Defense 8, identify the specific statute of limitations that you contend bars Mr. Briones' claim.

**ANSWER:**    Defendant would show that discovery is ongoing and will supplement with any specific evidence discovered.

**INTERROGATORY NO. 7 (10):** With respect to Affirmative Defense 9, identify the specific administrative remedies and prerequisites to suit that you contend have not been exhausted.

**ANSWER:**    Defendant would show that discovery is ongoing and will supplement with any specific evidence discovered.

**INTERROGATORY NO. 8 (11):** With respect to Affirmative Defense 10, identify the specific after-acquired evidence and state the general factual basis for your contention that such evidence bars Mr. Briones' claim.

**ANSWER:**    Defendant would show that discovery is ongoing and will supplement with any specific evidence discovered.

**INTERROGATORY NO. 9 (12):** With respect to Affirmative Defense 11, state the general factual basis for your contention that Mr. Briones did not bring his claim within six months.

**ANSWER:**    Defendant would show that discovery is ongoing and will supplement with any specific evidence discovered.

**INTERROGATORY NO. 10 (13):** If the defroster in Mr. Briones' truck had been non-operational, do you deny that this would have violated a regulation, standard, or order of the United States related to commercial vehicle safety, health, or security? If so, explain the basis for your contention.

**ANSWER:**    Defendant objects to this Interrogatory in that it is vague, general and overly broad in that if fails to adequately define "non-operational" and it calls for speculation. The defroster on Mr. Briones truck was operational and, therefore, Defendant is unable to speculate in regard to conditions that did not exist.

Law Offices of
# David C. Holmes

Certified in Labor and Employment Law
by the Texas Board of Legal Specialization

June 30, 2015

<u>By Fax (972) 850-4149</u>

OSHA
A. Maceo Smith Federal Building
525 Griffin Street, Suite 602
Dallas, Texas 75202

Re:    Surface Transportation Assistance Act Claim of Ricardo Briones

Dear Sir or Madam:

I represent Ricardo Briones. Mr. Briones files this complaint of retaliation under the Surface Transportation Assistance Act against his former employer, FedEx Freight, Inc.

Mr. Briones went to work for FedEx Freight in March 2011. During his five years of employment, he was mostly a pickup and delivery driver. He operated out of Harlingen, Texas.

Around May of 2015, Martha Coleman became the operations manager at Mr. Briones' facility. Almost immediately, Mr. Briones began to encounter a series of safety issues. For example, under DOT regulations, drivers are required to inspect their trucks before beginning work. FedEx Express typically allowed 30 minutes for this inspection. After Ms. Coleman arrived, FedEx Express began to pressure the drivers to leave without completing proper inspections. The drivers, including Mr. Briones, complained about this.

Despite the occasional issue with safety, Mr. Briones continued doing his job for another year. Then, in April 2016, the blower broke on Mr. Briones' truck. This is a serious matter, and a DOT safety violation, because Mr. Briones no longer had a working defroster. If the windows fogged up, Mr. Briones would have no visibility. Ms. Coleman refused to give Mr. Briones another truck and ordered him to drive the truck with a DOT safety violation. Mr. Briones reluctantly complied on that occasion. The blower was later restored to operating condition.

A few weeks later, however, the switch on the blower broke. This triggered a sequence of events that resulted in Mr. Briones' termination:

(1)    On Friday, May 20, 2016, the switch on the blower broke. This was during a period of heavy rains and flooding. The windows in the truck fogged up, so that Mr. Briones could not safely operate the truck. Mr. Briones requested another truck, and the supervisor on duty (Rick Weeks) told him to get another truck.

(2)    On Monday, May 23, 2016, Mr. Briones came to work and found that the blower was not yet repaired. He asked his supervisor (Gilbert Trevino) for another truck.

13201 Northwest Freeway, Suite 800
Houston, Texas 77040
713-586-8862

www.davidcholmeslaw.com
dholmes282@aol.com

APPENDIX 067
Briones 000 067

OSHA
June 30, 2016
Page 2 of 3

Mr. Trevino refused and ordered Mr. Briones to use the unsafe truck.  Mr. Briones refused to do so.  Eventually, Mr. Weeks intervened and gave Mr. Briones another truck.

(3)   On Tuesday, May 24, 2016, Ms. Coleman called Mr. Briones into her office.  She told him that he would be written up, and she would have made him drive the truck even if the blower did not work.

(4)   On Wednesday, May 25, 2016, Mr. Briones met with Irene Trench of HR in the morning.  He explained the situation.  As soon as he left the meeting, Ms. Coleman called him into her office and suspended him for "insubordination."

(5)   On June 1, 2016, FedEx Freight notified Mr. Briones that he had been terminated.

Mr. Briones filed for unemployment.  FedEx Freight contested the application, but the TWC's investigation "found that your employer fired you for a reason that was not misconduct connected with the work."

The STAA prohibited FedEx Freight from retaliating against Mr. Briones for refusing to operate an unsafe truck in violation of DOT regulations:

(1)   A person may not discharge an employee, or discipline or discriminate against an employee regarding pay, terms, or privileges of employment, because -

. . . .

(B)   the employee refuses to operate a vehicle because -

(i)   the operation violates a regulation, standard, or order of the United States related to commercial motor vehicle safety, health, or security; or

(ii)   the employee has a reasonable apprehension of serious injury to the employee or the public because of the vehicle's hazardous safety or security condition;

(2)   Under paragraph (1)(B)(ii) of this subsection, an employee's apprehension of serious injury is reasonable only if a reasonable individual in the circumstances then confronting the employee would conclude that the hazardous safety or security condition establishes a real danger of accident, injury, or serious impairment to health. To qualify for protection, the employee must have sought from the employer, and been unable to obtain, correction of the hazardous safety or security condition.

49 U.S.C. § 31105.  All of the elements are present:

OSHA
June 30, 2016
Page 3 of 3

(1)     FedEx Freight is a "person" for purposes of the STAA, in that it is a corporation. 29 C.F.R. § 1978.101(k).

(2)     Mr. Briones is an "employee" for purposes of the STAA, in that he is a driver of a commercial motor vehicle.  29 C.F.R. § 1978.101(e) and (h).

(3)     Mr. Briones refused to operate a vehicle because the operation would have violated a DOT safety regulation.

(4)     In addition, Mr. Briones refused to operate a vehicle because he had a reasonable apprehension of serious injury to himself or the public due to the unsafe condition of the vehicle.  Mr. Briones sought, and was unable to obtain, correction of the hazardous safety condition.

(5)     Mr. Briones was fired as a result.

Accordingly, Mr. Briones makes this complaint, requests that the allegations be investigated, and requests all remedies afforded by the STAA.

Here is the contact information for the parties to this proceeding:

Ricardo Briones
2701 S Calle Reina
Harlingen, Texas 78522

FedEx Freight, Inc.
P.O. Box 840
Harrison, Arkansas 72602-0840

Sincerely,

David C. Holmes